# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

DR. BERNARD T. LEONELLI, Deceased,
by his Personal Representative Susan M. Bentz,
Plaintiff-Appellant,

v.

CITY OF KENDALLVILLE,
PATROLMAN DOUGLAS M. DAVIS,
PATROLMAN MIKE MCCANN,
DETECTIVE LANCE WATERS,
SERGEANT LARRY RICHARDSON, and
PATROLMAN JOHNNY RICHIE,
Defendants-Appellees.

Appeal From the United States District Court For the
Northern District of Indiana, Fort Wayne Division
Case No. 1:07-CV-121-RBC
The Honorable Judge Roger B. Cosbey

---

**BRIEF AND REQUIRED SHORT AND SUPPLEMENTAL APPENDIX OF
PLAINTIFF-APPELLANT DR. BERNARD T. LEONELLI, DECEASED,
BY HIS PERSONAL REPRESENTATIVE, SUSAN M. BENTZ,
ORAL ARGUMENT REQUESTED**

---

Christopher C. Myers, #10043-02
CHRISTOPHER C. MYERS & ASSOCIATES
809 South Calhoun Street, Suite 400
Fort Wayne, IN 46802-2307
Telephone: (260) 424-0600
Attorney for Plaintiff-Appellant,
 Dr. Bernard T. Leonelli

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.: 08-3324

Short Caption: Dr. Bernard T. Leonelli v. City of Kendallville, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a governmental party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following the docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
      Dr. Bernard T. Leonelli, Plaintiff - Appellant

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
      Christopher C. Myers & Associates

(3)   If the party or amicus is a corporation:

      i)    Identify all its parent corporation, if any; and
            N/A

      ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:
            N/A

Attorney's Signature: _____ Date: September 18, 2008

Attorney's Printed Name: Christopher C. Myers

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).
Yes XX   No __

Address: 809 South Calhoun Street, Suite 400, Fort Wayne, Indiana 46802

Phone Number: (260) 424-0600   Fax Number: (260) 424-0712

E-Mail Address: cmyers@myers-law.com; dneumeyer@myers-law.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-v

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     Course of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3

     Disposition Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-13

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

    B.    The District Court Erred By Applying The Wrong Standard Of Review. . . 15-16

    C.    The District Court Erred In Determining The Existence Of Probable Cause As A Matter Of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-19

    D.    Qualified Immunity Was Not Available To Officer Davis. . . . . . . . . . . . . . 20-21

    E.    There Were No Exigent Circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

    F.    Defendants Unlawfully Searched Leonelli's Home Without A Warrant. . . . 22-23

    G.    Leonelli's Malicious Prosecution Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    H.    Punitive Damages Are Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7) . . . . . . . . . . . . . . . . . . vi

PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 31(e)(1) . . . . . . . . . . . . . . . . . viii

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(a) and 30(b) WITH REGARD TO
   APPENDIX MATERIALS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ix

SUPPLEMENTAL APPENDIX INDEX  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

# TABLE OF AUTHORITIES

<u>Cases</u>

*Hadley v. Williams*, 386 F.3d 747, 749 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hyatt v. Indianapolis Police Department*, No. 1:03-cv-00424-DFH-TAB, pp. 12-13 (S.D. Ind. 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . )17

*Kyllo v. United States*, 533 U.S. 27, 31 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 16

*Minnesota v. Olson*, 495 U.S. 91, 100 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

*Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Payton v. New York*, 445 U.S. 573, 586 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20

*Pearson v. Callahan*, Slip Op. 07-751, 555 U.S. ____ (2009) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rivera,* 248 F.3d at 680 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sheik V. Abdi v. McClellan*, 37 F.3d 1240, 1243 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . 16, 19

*Shephard v. Slater Steel*, 168 F.3d 998,1007 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Silverman v. United States*, 365 U.S. 505, 511 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Tawdul v. State*, 720 N.E.2d 1211 (Ind.App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Hardy*, 52 F.3d 147, 149 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Rivera*, 248 F.3d 677, 681 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. United States District Court*, 407 U.S. 297, 313 (1972) . . . . . . . . . . . . . . . . . 17

*Wellman v. State*, 703 N.E.2d 1061 (Ind.App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wheeler v. Lawson*, 539 F.3d 629, 633-34 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

iv

*Wong Sun v. United States*, 371 U.S. 471, 482 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

<u>Statutes</u>

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3

<u>Other</u>

IC §§ 35-44-2-1(a)(1), 35-44-2-2(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Plaintiff-Appellant, Dr. Bernard T. Leonelli, Deceased, by his Personal Representative Susan M. Bentz, pursuant to Fed.R.App. P. 28(a) and Circuit Rule 28, respectfully submits this brief appealing this district court's entry of judgment on Defendants' motion for summary judgment and its Opinion and Order granting Defendants' motion for summary judgment.

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction pursuant to 28 U.S.C. § 1331 over Leonelli's claims of false arrest, unlawful seizure, unlawful search, and malicious prosecution asserted under the Fourth Amendment of the United States Constitution and under 42 U.S.C. § 1983. (R. 1). On August 15, 2008, the district court granted summary judgment to Appellees. (R. 75, Opinion and Order (entered final judgment accordingly). (R. 76). Leonelli filed Notice of Appeal and a Rule 3(c) Docketing Statement on September 8, 2008. (R. 77, 78). This Court has jurisdiction over the district court's entry of final judgment entered on August 15, 2008, and its Opinion and Order, pursuant to 28 U.S.C. § 1291. This appeal is from a final judgment as to all claims and all parties. Dr. Leonelli died on September 28, 2008, after filing his Notice of Appeal. Pursuant to Circuit Rule 43 of the Federal Rules of Appellate Procedure, the decedent's personal representative, Susan M. Bentz, has filed a motion to be substituted as a party.

## STATEMENT OF ISSUES

I.    Whether the district court erred by applying the wrong standard of review.

II.   Whether the district court erred by granting judgment in favor of Defendants-Appellants as a matter of law.

## STATEMENT OF THE CASE

### Nature of the Case

This case revolves around whether Officer Davis had probable cause to enter Leonelli's home without a warrant. Leonelli filed claims of unlawful seizure, false arrest, and malicious prosecution and that Defendants' actions were unlawful under the Fourth Amendment and 42 U.S.C. § 1983. Because this an appeal from a grant of summary judgment, Leonelli will set forth his statement of facts in the light most favorable to Leonelli, the non-moving party below, as required by the appropriate standard of review.

### Course of Proceedings

Dr. Leonelli filed his Complaint alleging violations of the Fourth and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983, and various Indiana tort law violations, on May 8, 2007, in the Noble Superior Court. (R. 1). Defendants removed the case to the United States District Court for the Northern District of Indiana, Fort Wayne Division. (R. 2). Defendants' original answer was filed on or about June 27, 2007. (R. 18). Leonelli filed an amended complaint on or about October 10, 2007 (R. 25), to which Defendants filed an Answer and Affirmative Defenses on November 8, 2007 (R. 33). Plaintiff filed a Second Amended Complaint on or about November 29, 2007 (R. 45) to which Defendants filed an Answer and Affirmative Defenses on December 11, 2007. (R. 46). Defendants filed their motion for summary judgment on February 4, 2008 (R. 47). Plaintiff filed a motion to strike on April 7, 2008 (R. 57, 58), and Plaintiff's response opposing summary judgment was filed on April 21, 2008. (R. 59-61). Defendants filed a response opposing Plaintiff's Rule 56 motion to strike on April 22, 2008. (R. 62). Plaintiff filed a reply to that response. (R. 63). Defendants filed a

supplement to their motion for summary judgment and additional designated evidence on May 6, 2008. (R. 65). Defendants filed their own Rule 56 motion to strike on May 8, 2008. (R. 67). Leonelli filed a response to that motion. (R. 70). Leonelli filed a sur-reply to Defendants' reply to the response to motion for summary judgment. (R. 72). Defendants filed a reply to Plaintiff's response opposing Defendants' Rule 56 motion to strike. (R. 74). The district court granted Defendants' motion for summary judgment and granted Defendants' motion to strike on August 15, 2008. (R. 75). The Clerk's Entry of Judgment was made on August 15, 2008. (R. 76).

**Disposition Below**

The district court issued an Opinion and Order granting Defendants' motion for summary judgment on August 15, 2008. The Clerk's Entry of Judgment was entered on August 15, 2008. Leonelli filed his Notice of Appeal and Rule 3(c) Docketing Statement on September 8, 2008. (R. 77, 78).

**STATEMENT OF FACTS**

Dr. Bernard T. Leonelli ("Leonelli"), who had lived at the Granada Drive address in Kendallville, Indiana, since January of 2004, and who had been married to Mary Leonelli since December 30, 2004. (R. 59, Leonelli Dep. p. 4; Appx. 2). Jamie Leonelli is his ex-spouse. (Id.) Dr. Leonelli obtained his Masters in Psychology from Hofstra University in 1983 and his doctorate in clinical psychology from the University of Chicago in 1989. (Id. 7). Leonelli was arrested on May 3, 2006, and spent approximately eight (8) hours in the Noble County Jail. (Id. 14).

The Entry and Arrest

On May 3, 2006, Leonelli burned approximately three (3) or four (4) garbage bags of

clothing out on his front lawn. (Id. 38). Officer Davis arrived somewhere between 8:00 p.m. and 9:00 p.m. (Id. 40). Officer Davis arrived about fifteen (15) to twenty (20) minutes after the clothes were on fire. (Id. 51; Appx. 3). When asked whether he recalled Officer Davis saying to him, "Come here, I need to talk to you?," Leonelli replied, "No." Leonelli agreed that "[Davis] just walked into [my] house and placed [me] under arrest?" (Id. 51; Appx. 3). On May 3, 2006, Leonelli never gave permission to any officer to enter his home. (Id. 125; Appx. 4). Leonelli never gave permission to any officer to search through his home. (Id.). He told the officer that he was the only one at home. (Id. 103). Leonelli did not give permission to the officers to turn on and go through his computer. (Id. 126). Officer Davis admits that he ordered Leonelli to come to him, claims that Leonelli shook his head and did not comply and turned and went into the residence, at which time he went to the door to look inside, and then because Leonelli had something in his hand, Davis went into the residence and took Leonelli into custody and placed him in a patrol car. (R. 59, Def. Ans. Intgs. pp. 4-5). Nowhere in this report of 7/11/06 does Davis indicate, or even hint, that neighbors stated that they heard a woman screaming from Leonelli's residence. (Id.). Sgt. Mike McCann's "Narrative" claims that "Dispatch" stated that a male and female were fighting and that the male was throwing clothes in the front yard. (R. 59, McCann Narrative). But there are no "Dispatch Transcripts" which support this statement. (Compare to R. 59, Leonelli transcripts pp. 1-14). Furthermore, McCann states nothing about neighbors allegedly hearing screams from Leonelli's home. (Id.).

The narrative of Det. Lance Waters states that Leonelli "fled away," compared with Davis' report that Leonelli continued to walk into his residence. (R. 59, Narrative of Det. Lance Waters).

<u>Arrest for Invasion of Privacy/Protective Order</u>

Leonelli made it clear, when he learned that he was being arrested for Invasion of Privacy, that the protective order was in place in Porter County and it involved his ex-wife. (Id. 52). Regarding the protective order of Jayme D. Leonelli against Bernard Leonelli, which pended in Porter County, Case No. 64D03-0601-PO-733, it may be found as part of Plaintiff's Response opposing Defendants' Motion for Summary Judgment. (R. 59, ¶2; Appx. 5). As to the issue of the Protective Order, is that KPD states to the "Unit" that "Believe the protected person is going to be a Jayme Leonelli. Jayme Leonelli, appears to be out of Porter County." (Id. p. 5 of 14; Appx. 10). Kendallville Police Department acknowledged that Jayme lived in Porter County and that Mary (the current wife) lived in Kendallville, Indiana, and the Hobart officer agreed, "Ok, so this must be a totally different one then." (R. 59, 911 Transcript, p. 13 of 14; Appx. 18). Officer Davis also claims that he initiated the criminal charges of invasion of privacy after learning about the protective order. (R. 59, Davis Depo. 5). Officer Davis signed the information for invasion of privacy on May 3, 2006. (R. 59, Item 12(a); Appx. 30-33). Additionally, Officer Davis stated, under oath, that Jayme D. Leonelli informed him that there was a no contact protective order in place. (R. 59, Item 12(b); Appx. 32-33). Davis further alleged, under oath, that Jayme Leonelli (the "victim") "further advised that on the above date at approximately 9:34 p.m., Leonelli was on the property in violation of the protective order. (Id.) Of course, these averments under oath were fraudulent and false and directly lead to Leonelli's arrest for invasion of privacy. (Id.)

<u>Evidence of Exigent Circumstances</u>

Regarding statements from witnesses at the scene, and whether any of those witnesses

told any officer that they heard a woman "scream" from Leonelli's home on May 3, 2006, those reports may be found in the Record 59 (Voluntary Statements of Greg Miller, A.G. Risedorph, Ryan Risedorph, Stacey Snyder; Appx. 20-23). These statements indicate that the witnesses saw a fire in Leonelli's front yard – none of these witnesses ever said that they heard a woman screaming from Leonelli's home. (Id.)

Stacey Snyder, a neighbor of Leonelli's in May 2006, signed an affidavit stating that she did not tell police officers that she heard a woman screaming from inside the home prior to the officers' arrival. (Appx. 44, Snyder Aff. ¶5, R. 59). Nor, while she was standing with a group of people outside of Leonelli's home on May 3, 2006, ever hear anyone say that they heard screaming from the home. (Id. ¶6). Greg Miller, another neighbor who was present at the Leonelli home on May 3, 2006, also testified that, while he saw Dr. Leonelli throw clothing onto a fire in the front yard, he never told any of the police officers that he heard anyone scream from the home. (Appx. 47 Miller Aff., ¶5, 6; R. 59).

The first mention of a woman screaming from inside Leonelli's home is in the designated materials in support of Defendants' Motion for Summary Judgment. (R. 47). The affidavit of Officer Douglas Davis (R. 47, Ex. A) states that unidentified individuals stated that there was another "domestic, or fight" occurring at the Granada residence. (Id. ¶7). After observing Leonelli go into his home, Officer Davis opened the door, went in the home, and escorted Mr. Leonelli from it. (Id. ¶10). Officer Davis never mentions a "screaming woman" as exigent circumstances to enter Leonelli's home without a warrant. (Id. ¶¶1-19). Officer McCann does recall, in his affidavit, being informed by an unidentified neighbor of Leonelli that she heard a "woman screaming inside the home" prior to the officers' arrival – but this occurred *after* Officer

Davis had entered the home and escorted Leonelli from the home. (McCann Aff. ¶¶6, 7, 9; R. 47). Furthermore, Officer McCann testified that he noticed in the alleged "damage" to the Leonelli door frame *after* Davis had entered the home and escorted Leonelli out of the home. (Id. ¶10). Officer Richardson states that unidentified witnesses claimed to have heard a "woman screaming inside the home," but it is not clear from his affidavit whether that was before or after Davis had already entered the home and escorted Mr. Leonelli out. (R. 47, Ex. C, ¶7). Det. Waters also claims that unidentified witnesses stated that they heard a woman screaming, but his affidavit does not indicate whether that was before or after Davis entered Leonelli's home without a warrant. (R. 47, Ex. D, ¶7).

The Search

Defendants admitted that at no time on May 3, 2006, did they seek a search warrant for Plaintiff's home (Def. Req. Adm. No. 17; R. 59), but Defendants also stated, "However, exigent circumstances and probable cause existed, justifying a search." (Id.)

When Leonelli learned that the officers were called there for a "domestic," he stated:

> . . . these people called in and said it was a domestic and she wasn't even home. She wasn't even home. They got a call on a domestic, that's the funny thing. Domestic, and I'm home by myself. That's the joke. They got a call on a domestic and I'm home by myself. Who am I arguing with? I wasn't even talking, except on the – I wasn't even talking on the phone because I couldn't reach her. That's the joke. What domestic? . . . (Id. 56).

When asked about whether he had evidence that the officers did anything other than look for Mary while the officers were in his home, Leonelli responded:

> Yeah, because when I got out of jail next day – my computer was hooked up to the Internet. They got on the computer and went on the Internet and checked my websites out. I wasn't on the – I didn't even have time. I didn't do anything else when I got home. I didn't even have my computer hooked up. They hooked up online, plugged it in the Internet and checked out my websites. (Id. 56-57).

Plaintiff did not leave his computer plugged in, because the computer operated on a phone line and he does not leave it that way. (Id. 57)

Leonelli estimates that he was driven away from his home at about 11:00 p.m. and that his wife, Mary Leonelli, arrived sometime thereafter, around midnight. (Id. 58)

<u>The 911 Call/What the Kendallville Police Department Knew</u>

Regarding what the Kendallville Police Department ("KPD") knew regarding the fire and whether Leonelli was violating a Protective Order on May 3, 2006, the "Leonelli Transcript of 911 Call" was attached to Plaintiff's Response. (Appx. 6-19; R. 59, ¶3, attached Transcript, pp. 1-14). The Kendallville Police Department received information that "the husband is throwing things out into the yard setting them on fire." (Id. 1). Noteworthy is that there is no complaint or discussion about a woman screaming. (Id.). In a telephone conversation between the Kendallville Police Department and the Porter County Sheriff's Department, Kendallville reported that Leonelli had taken, "All of her clothes and he set them on fire out in the front yard." (Id. p. 12 of 14). Kendallville Police Department acknowledged that Jayme lived in Porter County and that Mary (the current wife) lived in Kendallville, Indiana, and the Hobart officer agreed, "Ok, so this must be a totally different one then." (Appx. 18, R. 59, 911 Transcript, p. 13 of 14).

Regarding the alleged damage to the door frame – Mary Leonelli testified "that was always like that from the time we bought it. . . . You can tell how old it was if you'd look inside. There was dirt and stuff built up on the inside of it. We bought that house that way. . . ." (R. 59, Mary Leonelli Depo. p. 32).

When Mary Leonelli arrived home on May 3, 2006, and awoke the next morning and went into her kitchen to make coffee, she noticed that every drawer and every cabinet in her

kitchen had been opened. (Id. at 35).

A report prepared by Officer Douglas M. Davis (the report was prepared July 11, 2006), entitled "Details Of Investigation," Davis admits that after he arrived at Leonelli's home, he observed Leonelli start to enter his residence and asked him to come with him so "we could talk." (Appx. 34). Davis admits that Leonelli walked inside the residence, and then Davis opened the front door and asked Leonelli to come out of his house. (Id.). Davis claims that Leonelli was holding something, so Davis entered the residence and grabbed both arms of Leonelli and pulled him outside, and then placed handcuffs on him. (Id.). Officer Davis also admitted that the house was searched (extensibly for "other subject"). (Id.). Officer Davis noted "prior damage to the front door" and speculated that he had been open – but he noted no fresh damage to the front door. (Id.). Waters claims to have noticed evidence of forced entry but does not indicate what that evidence was, or whether it was "old" or "fresh." (Appx. 36). The narrative of Waters says nothing about neighbors reporting "screaming" coming from Leonelli's home. (Id.).

The affidavit of Dr. Leonelli is set forth below, verbatim, because of its importance regarding the Motion to Strike, as well as the ruling on the Motion for Summary Judgment (Appx. 37-43, R. 59, Leonelli Aff.):

1. My name is Dr. Bernard Leonelli. I am over the age of 21 years. I am personally competent to testify about the matter set forth herein, and I have personal knowledge of these matters.

2. On May 3, 2006, I lived with my wife, Mary Leonelli, at 613 Granada Drive, Kendallville, Indiana. No one else lived at the home with us on that date. This was the address that was on my driver's license at the time.

3. In the early evening of May 3, 2006, I went out to eat with my wife, Mary at Mad Anthony's restaurant in Auburn, Indiana. On the way home, I dropped her off near the home of her daughter and proceeded to return to our home on Granada Drive by myself. No one else was at home with me.

4.	After being home for a while, I took several bags of old clothing (belonging to both Mary and I) that had been set by the front door to be sorted through for garage sales, and removed them to the front of my lawn. I then set them on fire. I did this on my own property.

5.	After setting the bags on fire, I went back into my home. As I re-entered my home, I did not lock the front door behind me, but did shut a screen door that was behind me. I continued to walk through a hall going towards the back of my home and was turning around with a cell phone in my hand trying to call my wife when I saw a police officer who had just entered through my front door. Up until that point, I did not know that there was any police officer on my property, much less following me into my home. Officer Davis had said nothing to me up to this point and had failed to either knock, ring the doorbell, or announce himself before entering my home.

6.	As I tried to call Mary, Davis announced himself as a Kendallville Police Officer and informed me that I was under arrest for resisting law enforcement.

7.	I was unarmed, and did not try to fight or flee. Nevertheless, I was handcuffed before being escorted by Davis to a squad car sitting in front of my house. I cooperated with Davis' efforts to escort me out of my house.

8.	While I was in the squad car, I talked to Officer Davis. He, at one point, asked me about a Protective Order/No-Contact Order, and I told him that it was regarding my ex-wife, Jayme, who lived in Porter County. At the time, and now, Jayme Leonelli lived in Valparaiso, Indiana, which is in Porter County. I told the officer, furthermore, that the Protective Order did not have anything to do with my Granada Drive address. Furthermore, officers knew that I lived at the Granada Street address that I had just been removed from because Davis checked my driver's license while we were still at the scene, and my driver's license had my Granada Street address on it. Nevertheless, before being taken to the Kendallville Police Department, I was informed that I was being charged with resisting law enforcement by fleeing police and violation of the restraining order that my ex-wife, Jayme, had.

9.	After Davis talked to me in the squad car, I was left to wait there, as it sat in front of the house, for over an hour. As I waited, I became aware that police officers were going in and out of my house. I asked Davis a number of times why they were doing this, and he told me that they were "looking for Mary." I had told Officer Davis, and possibly a second officer that I now believe was named Waters, that I had a disagreement with my wife, Mary, earlier in the evening, had dropped her off in the area of Main Street in Kendallville when we were riding home from a restaurant, and that Mary had not gotten home yet. I never told the

officers that Mary and I had been in any physical fight.

10.     None of the Defendants – Officer Davis, Waters, Richie, Richardson, or McCann
        – ever asked me if they could go into my house. None of them ever asked me if
        they could check inside the house to make sure that Mary or someone else wasn't
        inside needing help. All they told me about their activities inside the house was
        that they were "looking for Mary," but not why or what for. None of them said
        anything about looking for my ex-wife, Jayme. I don't know why I was charged
        with invasion of privacy relating to Jayme's No-Contact Order, since Jayme had
        not been at my home on Granada Drive, and lived in a totally different city from
        me.

11.     Eventually, the charges I was arrested for were dismissed. The invasion of
        privacy charge was dismissed on June 23, 2006, because I was innocent of the
        charge. I was similarly innocent of resisting law enforcement, and that charge was
        dismissed on April 4, 2007, when the judge at my criminal trial found me not
        guilty of the charge. On May 3, 2006, I did nothing to attempt to flee or fight any
        of the officers that went into my home. I did not try at any point to run from
        Officer Davis, and when I entered my home I took my time, because I had no idea
        he or any other officers were present and had no idea that any officer wanted to
        talk to me. If he had bothered to knock on the door or ring the doorbell once I was
        inside the house, I would have let him in. However, he did not do this, and at no
        point did I invite him into my home. Similarly, at no point did any of the officers
        at my home ask to search it, nor did I give them permission. None of them
        obtained a search warrant either before entering my home.

12.     I was also innocent of the Violation of Privacy charge. On May 3, 2006 I did not
        have contact with my ex-wife, Jayme, nor had she been at my home.

13.     When the Defendants searched my home, they looked in cabinets and in drawers,
        and searched my computer. My kitchen cabinets are too small to fit an adult into.
        The bedroom drawers also are too small to fit an adult into. I know this because
        when I got home the next morning my wife, Mary, was home and she told me
        about finding her dresser drawers had been gone through and that cabinets had
        been gone through. Mary said she had not gone through them and I know I had
        not gone through the drawers or cabinets. To the best of my knowledge from the
        time that I had arrived home the evening before, up to the time that Mary returned
        to the home, no one had been in the home other than myself, Officer Davis, and
        the other officers that searched my home, while I waited in the squad car in front
        of my house.

14.     In addition to having the drawers and cabinets within my home searched through,
        I learned that the Defendants had also searched my computer because it was on
        when I got home the next morning it was on although I had not had it on when I

was removed from the home the night before. In addition, Mary said she had not gotten on the computer either. Again, the only other persons what would have had access to the computer before my arrival home the next morning would have been the Defendants. I was concerned about my computer having been searched because I do some of my work on my home computer and it contains confidential information.

15.     On the day of my arrest on May 3, 2006, there was minor, pre-existing damage on the frame to the front door of my house. This damage reflected in the photos shown in Exhibit 11(a) and (b). These photos accurately reflect what the door and door frame looked like on the day of the arrest. The frame has had a hairline crack in it since I bought the house, which is located on the portion of the frame along the middle right-hand-side of the door. The frame has not been painted, or repaired since I bought the house in 2004.

16.     I never tried to kick in the door to my home. The frame to my front door was not splintered, and the damage on it is cosmetic. On May 3, 2006, when officers were at my house, there were no foot prints on the door or door frame, no large scratches, no blood stains, and no other markings on it either, other than for the crack in the door frame. In addition, the door opened and closed without problem, and the door handle and locking mechanism were undamaged.

17.     I never told any of the officers that I had damaged the door or door frame of my home by breaking through the door.

18.     There had been no argument at my home on May 3, 2006, neither with my wife Mary, or my ex-wife, Jayme. I had not even had any contact with my ex-wife that day, nor for some time prior to that day, and she had not been at my home. When I returned to my home after eating out with my wife Mary, and after dropping her off near her daughter's apartment, I was alone at my residence until officers arrived. There was no yelling or screaming at my residence, either before or after the officer's arrival.

FURTHER AFFIANT SAYETH NAUGHT.


                                        _____
                                        Dr. Bernard Leonelli, Affiant

I affirm under penalties for perjury that the above and foregoing representations are true.



                                        _____

## SUMMARY OF ARGUMENT

Defendants' creation of exigent circumstances (neighbors reporting a woman screaming from Leonelli's home) was based upon unverified, untrustworthy information from unidentified declarants and was deliberately manufactured to provide *post-hoc* justification for entering Leonelli's home without a warrant in violation of the Fourth Amendment of the United States Constitution. The district court, only by construing the disputed facts and inferences therefrom in favor of the officers, determined otherwise and granted Defendants' Motion for Summary Judgment. It was error to determine that Defendants were entitled to qualified immunity as a matter of law. Applying the wrong standard of review (viewing the facts from the perspective of the police officers), produced an erroneous decision. The district court failed to examine the facts from the prospective of a *reasonable* officer, and failed to credit the Plaintiff with any of the disputed facts or inferences therefrom. An abundance of evidence supports Leonelli's claim that Officer Davis recklessly and callously violated his Fourth Amendment right to be free from unreasonable search and seizure. Davis had no warrant to enter Leonelli's home and no probable cause to open the door and retrieve Leonelli.

Contriving probable cause by relying upon unnamed, untrustworthy, and unverified hearsay accounts from imagined neighbors is against the Fourth Amendment. Officer Davis was callously and recklessly indifferent to Leonelli's Fourth Amendment rights by arresting him for a No-Contact/Protective Order that existed in Porter County involving his ex-wife, rather than Noble County involving his current wife. Officer Davis lied and committed perjury by signing an

Affidavit stating that he personally spoke with Jayme Leonelli regarding the no contact protective order. The district court ignored this evidence determining that Davis, as a matter of law and fact, had probable cause to arrest Leonelli for invasion of privacy.

The district court erred by striking Leonelli's Affidavit and by granting judgment as a matter of law to Defendants on Leonelli's Fourth Amendment claims.

## ARGUMENT

The district court applied the wrong standard of review resulting in the district court examining the facts and reasonable inferences therefrom in favor of the Defendant police officers, warranting reversal. It was error to grant Defendants' qualified immunity and to determine that Leonelli failed to present evidence in support of his claims that Defendants acted recklessly and callously indifferent to his Fourth Amendment right to be free from unreasonable seizure. There was no probable cause to enter his home. There was no warrant. Minimally, there was a question of fact as to the existence of exigent circumstances.

### A.    Standard of Review.

"This court reviews *de novo* and grant of summary judgment. . . . All facts and inferences must be construed in favor of the non-moving party, here, [Dr. Leonelli] . . . [The court does] not evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter; rather, [the court] determine[s] whether there exists a genuine issue of triable fact.... Summary Judgment is proper if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law' . . . to overcome a motion for summary judgment, the non-moving party must come forward with

specific facts demonstrating that there is a genuine issue for trial... the non-moving party must show that there is evidence upon which a jury reasonably could find for the plaintiff. . . ." *Wheeler v. Lawson*, 539 F.3d 629, 633-34 (7th Cir. 2008). "In determining whether an officer had probable cause, the court steps into the shoes of a reasonable person in the position of the officer. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)." *Wheeler*, 539 F.3d at 634. In evaluating probable cause, the court examines the facts as they would have appeared to a reasonable person in the position of the arresting officer. *Id.* The probable cause determination must be made by a jury "if there is some room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 2006), quoted in *Wheeler*, 539 F.3d at 634.

**B.     The District Court Erred By Applying The Wrong Standard Of Review.**

The district court failed to articulate the correct standard of review regarding how the facts and circumstances are to be perceived by a *reasonable* person in the position of the officer. (R. 75 pp. 1-4). In fact, the district court misstated the standard of review: "As the defendants are claiming immunity the facts and circumstances *as perceived by the Defendant Officers* are paramount in this case. Furthermore, the existence of probable cause is determined by what the Defendant Officers knew and believed at the scene. Leonelli's versions of the facts are included as relevant." (R. 75 p. 4). The district court got it wrong. The district court examined this case through a prism which colored the facts in favor of the Defendant Officers and relied upon the subjective perceptions of the Officers which the district court found "paramount in this case." (Id.). The district court relied heavily upon what the Defendant Officers subjectively "knew and believed at the scene" to the exclusion of "Leonelli's version of the facts" to which the district

court paid only minimal attention "as relevant." (R. 75 p. 4 fn 2). Even the existence of exigent

circumstances (which are "few in number and carefully delineated" *Sheik V. Abdi v. McClellan*,

37 F.3d 1240, 1243 (7th Cir. 1994)), is a fact-sensitive analysis. *Minnesota v. Olson*, 495 U.S. 91,

100 (1990). The principle of evaluating exigent circumstances based upon the situation that the

officers faced at the time, *United States v. Rivera*, 248 F.3d 677, 681 (7th Cir. 2001),

> does not mean that the court must accept the officers' *own* testimony about the
> situation they faced. On the motion for summary judgment, the court must view
> the evidence about the situation the officers faced in the light reasonably most
> favorable to the plaintiff, giving him the benefit of all conflicts in the evidence
> and of favorable inferences from that evidence.

*Hyatt v. Indianapolis Police Department*, No. 1:03-cv-00424-DFH-TAB, pp. 12-13 (S.D. Ind.

2004). The district court was flatly wrong in analyzing this case from the subjective viewpoints

of the Defendant Officers (R. 75 p. 4 fn 2). The district court was just as wrong to dismiss

"Leonelli's version of the facts" as just "relevant" (*Id.*).

## C. The District Court Erred In Determining The Existence Of Probable Cause As A Matter Of Law.

At pages 8 through 14 of its Order and Opinion (R. 75), the district court determined

there was probable cause to enter Leonelli's home and arrest him. The district court was wrong.

To enter Leonelli's home, Officer Davis either had to have a warrant, or their had to be exigent

circumstances or some other probable cause to justify the warrantless entry. See *Payton v. New

York*, 445 U.S. 573, 586 (1980); *Rivera,* 248 F.3d at 680. Officer Davis had neither.

The Fourth Amendment provides in part: "The right of the people to be secure in their

person, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated...." "'At the very core' of the Fourth Amendment 'stands the right of a man to retreat

into his own home and there be free from unreasonable governmental intrusion.'" *Kyllo v.*

*United States*, 533 U.S. 27, 31 (2001), quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961). Warrantless searches and seizures inside a residence therefore are presumed to be unreasonable. *Payton*, 445 U.S. at 586; *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) ( "'It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed'"), quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972).

In finding probable cause, the district court accepted Officer Davis' argument that Leonelli resisted by failing to comply with his request that Leonelli speak with him. (R. 75, pp. 9-12). The district court's analysis is fatally flawed, because the court accepted Davis' version of the facts and not Leonelli's. Leonelli testified in his deposition that Officer Davis gave no command. (Appx. 3; Leonelli Depo. 51). When pressed about the "possibility" that Officer Davis gave a command that Leonelli did not hear, Leonelli capitulated that it was "possible." Mere possibilities aside, Leonelli made clear in his affidavit that Officer Davis gave no such command. (Order p. 12; Leonelli Depo. 118). It was inappropriate, therefore, for the court to strike Leonelli's affidavit and consider the evidence most favorable to Officer Davis. (Order p. 27-30). A party may explain conflicts in his deposition testimony and may clarify that testimony by way of an affidavit. *Shephard v. Slater Steel*, 168 F.3d 998, 1007 (7th Cir. 1999).

The court then ruled under *Tawdul v. State*, 720 N.E.2d 1211 (Ind.App. 1999), and *Wellman v. State*, 703 N.E.2d 1061 (Ind.App. 1998), that Leonelli's disobedience to an order (which Leonelli claims was never given) not to retreat into his home may serve as the basis for a warrantless entry and seizure. (R. 75 pp. 13-14). But *Tawdul* is inapposite to the facts of the case *sub judice*, because the individual there exited a vehicle after the officer told him to stay in the car, and the court ruled that "the police have a limited right to briefly detain a passenger who

exits a vehicle after it has been lawfully stopped." 720 N.E.2d at 1216-17. The fact is in *Wellman* are more on point – a homeowner was convicted of resisting law enforcement because the officer expressly told the homeowner not to go inside and the homeowner disobeyed. 703 N.E.2d at 1062. But in this case, Leonelli disobeyed no such order – at best, Officer Davis "asked a male subject standing on the porch to come to my direction." (R. 59, Davis Depo. p. 6). Davis claims that he asked Leonelli to again come toward him. (Id. 7). Of course, if we credit Leonelli regarding this dispute, then Officer Davis said nothing and Leonelli did not disobey an order by going in the home. (Appx. 3; R. 59, Leonelli Depo. p. 51; Leonelli Aff. ¶5). Regardless, Officer Davis claims that Leonelli moved his head as if to say "No," and turned around and went into his residence. (Davis Depo. p. 7). At that point, Officer Davis "opened the storm door and entered the residence." (Id. p. 8). Davis claims that he pulled Leonelli out of the house "for my safety and the safety of others. (Id. 9). Reasonable jurors could conclude that Leonelli was not "ordered" to stay outside the home.

But even if Officer Davis had given such an order, the remedy is not to violate the Fourth Amendment and enter a man's home without a warrant and without probable cause. Indiana decisional law does not supersede federal § 1983 law. Leonelli was not committing a crime when he entered his home. He was a not a dangerous fleeing felon, at least not in the eyes of a reasonable officer in the position of Defendant Davis. Furthermore, even if the words "come to [me] and talk to [me]" could be construed as an *order*, the Fourth Amendment would still require a warrant to extract the individual: "'At the very core' of the Fourth Amendment 'stands the right of a man to *retreat into his own home* and there be free from unreasonable governmental intrusion.'" *Kyllo*, 533 U.S. at 31 (emphasis added). Leonelli concedes where both exigent circumstances and probable cause are present, a warrantless entry may be permissible. *Rivera*,

248 F.3d at 680. However, exigent circumstances exist when there is a compelling need for official action and no time to secure a warrant. *United States v. Hardy*, 52 F.3d 147, 149 (7th Cir. 1995). Exigent circumstances are "few in number and carefully delineated." *Sheik V. Abdi v. McClellan*, 37 F.3d 1240, 1243 (7th Cir. 1994). Exigent circumstances (which may include hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to the police or to other persons) did not exist when Officer Davis decided to enter Leonelli's home simply because Leonelli entered his own residence. See *Minnesota v. Olson*, 495 U.S. 91, 100 (1990). No warrant, no exigent circumstances, no probable cause – Davis violated Leonelli's Fourth Amendment rights.

### D. Qualified Immunity Was Not Available To Officer Davis.

The district court next determined that defendants were entitled to qualified immunity and determined that "Leonelli ignore[d] all of the undisputed and relevant facts." (R. 75, pp. 14-17, p. 16). Under *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), the question regarding qualified immunity was whether: (i) the facts (taken in the light most favorable to the party asserting the injury) alleged show the officer's conduct violated a constitutional right, and (ii) would it be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Recently, the United States Supreme Court has softened its strict application of *Saucier*. See *Pearson v. Callahan*, Slip Op. 07-751, 555 U.S. ____ (2009). (The Supreme Court revisited *Saucier* and concluded that lower federal courts are not mandated to apply the two-step test mandated by *Saucier*. Even if *Pearson* controls, the defendants were not entitled to qualified immunity, as the law was clearly established at the time of Davis' entry into Leonelli's home that the Fourth Amendment prohibited entering a home without a warrant and without probable cause. *Payton v. New York*, 445 U.S. at 586; *Hadley v. Williams*, 386 F.3d 747, 749 (7th Cir.

2004).

The district courts grant of qualified immunity was erroneous, the result of applying the wrong standard of review. For example, the district court determined that Leonelli "clearly...refused to comply with Officer Davis' request...." (Order p. 15). But Leonelli clearly stated "No" when asked about such a request. (Leonelli Depo. p. 51; Leonelli Aff. ¶5). The fire on the front lawn may have amounted to an ordinance violation, but that is no reason to trample upon the Fourth Amendment rights on a person who has retreated into his home. The burning of a woman's clothing is demonstrative, perhaps, of a childish way of dealing with a personal dispute but is no excuse to violate the Fourth Amendment by entering a man's domicile without a warrant. The damage to the front door was old and not freshly splintered as evidenced by the photographs (R. 59), and gave no reason for Davis to violate the Fourth Amendment, particularly when the so-called "damage" was noticed *after* Davis' warrantless intrusion into Leonelli's home. The district court's reasoning that a "verbal altercation" between husband and wife is evidence of a possible violation of a protective order is absurd (Opinion, p. 16), given that the protective order was issued from Porter County in favor of *Jayme* not *Mary*. Even more disturbing is that Davis committed perjury and falsified the Information by claiming that Jayme Leonelli personally informed him that there was a no contact protective order in place and advised him that Leonelli was on the property in violation of the protective order. (R. 59, Item 12(b)). In other words, the district court discredited all of Leonelli's evidence, bent over backwards to accept the Defendants' facts and reasonable inferences therefrom, and overlooked the lies and fraudulent representations of Officer Davis in justifying Leonelli's arrest for Invasion of Privacy. Reversal is warranted on the ruling finding qualified immunity.

      **E.**     **There Were No Exigent Circumstances.**

At pages 16 through 20 of its Order, the district court determined that exigent circumstances permitted Davis to enter Leonelli's home without a warrant to arrest him. But again, the district court construed the facts and circumstances in favor of the Defendants and against Leonelli. Officer Davis was dispatched to Leonelli's home because of a fire burning on the front lawn (KPD 911 Transcript, pp. 1, 12). Davis claims, and the court accepted the proposition, that an unidentified "neighbor" stated that there was a fight occurring at the residence. The problem here is that an officer cannot manufacture probable cause by relying upon an unidentified declarant whose account cannot be verified. See *Wong Sun v. United States*, 371 U.S. 471, 482 (1963) (There can be no probable cause for an arrest when it is based upon an officer's reliance on vague information from a source of untested reliability.). Defendant officers cannot identify one single neighbor or other individual who provided information that there was a "fight" or that they heard a woman screaming from inside Leonelli's home. The KPD 911 Transcript contains no such information. The Officers' initial reports contain no such information. The first time we learn about these self-serving statements is in the officers' affidavits. How convenient is it that the officers failed to get the names and telephone numbers of the witnesses who provided testimony of a "fight" and heard screams coming from inside Leonelli's home? A reasonable jury could determine that the exigent circumstances were fabricated and manufactured.

The witness statements and affidavits of the neighbors who were present state clearly that they never told the officers about a "fight," nor did they tell the officers about a woman screaming from inside the home. The court also neglected to consider Leonelli's evidence that the alleged damage to the door frame was old – basically a hairline crack that had been repaired long ago – as the photographic supports. (R. 59). Even the officers do not claim that they saw

freshly splintered wood which would indicate a recent forced entry into the home. Finally, the district court ignored the proposition that there could have been no screaming woman from inside Leonelli's home – the only woman who lived there was Mary, and she had not been home that evening. But again, straining to support the officers' rendition of the facts, the district court determined that Leonelli had "not submitted any evidence contradicting that <u>someone reported</u> a woman screaming." (Order p. 19 fn 8). Leonelli claims this information is fabricated and is false. But he cannot prove a negative – the officers provided no names; they cannot verify information; they cannot identify the declarants. At best, this is "vague information from a source of untested reliability" which cannot serve as probable cause for an arrest. *Wong Sun*, 371 U.S. at 482.

**F.      Defendants Unlawfully Searched Leonelli's Home Without A Warrant.**

On pages 20 through 22 of the Order, the district court justified its determination that exigent circumstances allowed the officers to search Leonelli's home without a warrant. Much of the above discussion applies here – there was no probable cause and no exigent circumstances, except those that were manufactured by the Defendants. The facts viewed in a light most favorable to Leonelli indicate that: (i) the officers manufactured information regarding a "fight" and a "screaming woman" to justify the arrest of Leonelli and the search of his home; (ii) Leonelli saw drawers pulled out and cabinets opened, and there is no evidence that anyone else was in the house besides the officers; (iii) Leonelli testified that his computer was left on which he never does and a logical inference was that the officers turned it on and searched his computer, as there is no evidence that anyone else did it. No reasonable police officer can rely upon vague – or contrived/manufactured – information from a source of untested reliability to establish probable cause. The district court's ruling to the contrary warrants reversal.

**G.      Leonelli's Malicious Prosecution Claim.**

On pages 23 and 24 of the Order, the court justifies its dismissal as a matter of law of Leonelli's malicious prosecution claim. This ruling cannot stand, because Davis' reckless initiation of criminal charges against Leonelli by falsely swearing to facts that he spoke with Jayme Leonelli who advised him about the no contact protective order, was based upon a lie – Davis committed perjury. (Id.) (Compare Information, R. 59, Item 12(a)(b)). See *Reynolds v. U.S.,* No. 08-1634 (7th Cir. 12-9-2008)(fueling prosecution with knowingly false information is not a protected act under the discretionary function exception of IC §§ 35-44-2-1(a)(1), 35-44-2-2(d)(1). Probable cause cannot be premised upon a deliberate lie, or perjury. An officer who provides false information to initiate criminal proceedings must be liable under a theory of malicious prosecution. (Id.) Davis was not "enforcing" a law when he committed perjury and falsely signed an Information which caused Leonelli to be prosecuted. There is no dispute that Leonelli had criminal charges against him, that he was prosecuted, that there was no probable cause because of the falsity of Davis' statements which initiated the prosecution, and that Leonelli won the criminal case on the merits.

### H.    Punitive Damages Are Appropriate.

On pages 23 and 24 of the Order, the court determined that punitive damages could not be asserted. This ruling warrants reversal. Reasonable jurors could conclude that the officers, and all of them, lied to fabricate exigent circumstances; that Officer Davis lied in order to enter Leonelli's house without a warrant and to arrest Leonelli; that Davis lied and committed perjury when signing the Information to prosecute Leonelli for Invasion of Privacy, because of a protective order issued about one hundred (100) miles away (Porter County) in favor of a different person (Jayme Leonelli), and it could not have been an honest mistake, because Davis stated, under oath, that he spoke with Jayme Leonelli – an outright lie. These officers (including

bystanders) were deliberately indifferent and acted intentionally in fabricating exigent

circumstances in arresting Leonelli without a warrant, and entering his home without probable

cause, searching his home without reason, and presenting false information to initiate criminal

proceedings against him. Punitive damages are appropriate.

## CONCLUSION

For the reasons stated above, the ruling of the district court should be reversed and the

case remanded for a trial by jury, for reasonable attorneys fees and costs, and for all other just

and proper relief in the premises.


Respectfully submitted,

**CHRISTOPHER C. MYERS & ASSOCIATES**


_____
Christopher C. Myers, #10043-02
809 South Calhoun Street, Suite 400
Fort Wayne, Indiana 46802
Telephone:     (260) 424-0600
Facsimile:     (260) 424-0712
Attorney for Appellant, Bernard T. Leonelli,
Deceased, by his Personal Representative Susan M.
Bentz

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

The undersigned, counsel for the Plaintiff-Appellant, Bernard T. Leonelli, Deceased, by his Personal Representative Susan M. Bentz, furnishes the following in compliance with Fed. R. App. P. 32(a)(7):

I hereby certify that this brief conforms to the rules contained in Fed. R. App. P. 32(a)(7) for a brief produced with a proportionally spaced font. The length of this brief is approximately 4,700 words. This word count was calculated by Corel WordPerfect Office 12 and according to the Federal Rules of Appellate Procedure 32(a)(7) does not include the Cover, Table of Contents, Table of Authorities, Signature Block, Certificate of Service and this Certificate of Compliance with Fed. R. App. P. 32(a)(7). This word count does include headings, footnotes, and quotations.

I affirm under the penalties for perjury that the foregoing statements are true and correct as calculated by the word count of the Corel WordPerfect Office 12 used to prepare the petition.


Dated: January 30, 2009


_____
Christopher C. Myers

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

DR. BERNARD T. LEONELLI, Deceased,
by his Personal Representative Susan M. Bentz,
Plaintiff-Appellant,

v.

CITY OF KENDALLVILLE,
PATROLMAN DOUGLAS M. DAVIS,
PATROLMAN MIKE MCCANN,
DETECTIVE LANCE WATERS,
SERGEANT LARRY RICHARDSON, and
PATROLMAN JOHNNY RICHIE,
Defendants-Appellees.

Appeal From the United States District Court For the
Northern District of Indiana, Fort Wayne Division
Case No. 1:07-CV-121-RBC
The Honorable Judge Roger B. Cosbey

PROOF OF SERVICE

The undersigned certifies that one copy of the foregoing Brief and Required Short
Appendix of Appellant, Bernard T. Leonelli, Deceased, by his Personal Representative Susan M.
Bentz, has been served on the following counsel of record on January 30, 2009, by first-class,
United States mail, postage prepaid addressed to:

Andrew S. Williams, Esq.
Daniel J. Palmer, Esq.
Linda J. Polley, Esq.
Hunt Suedhoff Kalamaros, LLP
803 South Calhoun Street, #900
Fort Wayne, Indiana 46802

_____
Christopher C. Myers
Attorney for Plaintiff-Appellant

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 31(e)(1)**

The undersigned, counsel of record for the Plaintiff-Appellant Bernard T. Leonelli, Deceased, by his Personal Representative Susan M. Bentz, furnishes the following in compliance with Circuit Rule 31(e)(1):

I hereby certify that a digital version of this Brief, including the Appendix, was furnished to the Court and to each party separately represented by counsel, in PDF and on floppy disk, at the time the paper brief was filed.

Dated: January 30, 2009

_____
Christopher C. Myers

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(a) and 30(b) WITH REGARD TO APPENDIX MATERIALS**

I, the undersigned, certify that all of the material required by Circuit Rule 30 are included in the attached Appendix. Those materials required by Rule 30(a) are bound with Appellant's main brief, as well as those materials required by Rule 30(b).

Dated: January 30, 2009

_____
Christopher C. Myers

# SUPPLEMENTAL APPENDIX INDEX

Bernard Leonelli Deposition Excepts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jayme Leonelli / Porter County Protective Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Transcript 911 Call (KPD) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Greg Miller Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

AJ Risedorph Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ryan Risedorph Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Stacey Snyder Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Douglas Davis Deposition Excerpts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Photos (Door Jam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

Information for Invasion of Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Affidavit for Probable Cause (Invasion) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Davis Report (Details of Investigation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Narrative of Sgt. McCann . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Narrative of Lance Waters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Affidavit of Dr. Bernard Leonelli . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Affidavit of Stacey Snyder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Affidavit of Greg Miller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

A0 450

# United States District Court

## Northern District of Indiana

DR. BERNARD T. LEONELLI
Plaintiff

JUDGMENT IN A CIVIL CASE

v.

**Case No. 1:07-CV-121 WCL**

THE CITY OF KENDALLVILLE;
OFFICER DOUGLAS M. DAVIS #3249;
PATROLMAN MIKE McCANN;
DETECTIVE LANCE WATERS;
SERGEANT LARRY RICHARDSON
and PATROLMAN JOHNNY RICHIE
Defendants

[ ]    **Jury Verdict.** This action came before the court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[X]    **Decision by Court.** This action came to trial, hearing or consideration before the Court. The issues have been tried, heard or considered and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of defendants the City of

Kendallville; Officer M. Davis #3249; Patrolman Mike McCann, Detective Lance Waters; Sergeant

Larry Richardson and Patrolman Johnny Richie and against plaintiff Dr. Bernard T. Leonelli.

Stephen R. Ludwig, Clerk

By___s/ J. Padly_____
Deputy Clerk

:

This document entered pursuant to Rules 79(a) and 58
of the Federal Rules of Civil Procedure on **August 15, 2008**.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

DR. BERNARD T. LEONELLI,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀CIVIL NO.  1:07cv121
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
CITY OF KENDALLVILLE, et al.,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀)

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendants

on February 4, 2008.  The plaintiff, Dr. Bernard T. Leonelli ("Leonelli"), responded to the

motion on April 21, 2008, to which the defendants replied on May 9, 2008.  Leonelli filed a sur-

reply on May 14, 2008.

Also before the court is a motion to strike filed by Leonelli on April 7, 2008.  The

defendants responded to the motion on April 22, 2008, to which Leonelli replied on April 28,

2008.

Additionally, on May 8, 2008, the defendants filed a motion to strike.  Leonelli filed a

response on May 13, 2008, to which the defendants replied on May 22, 2008.

Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his

opponent's claim.  Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir.

1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline

<u>Corp.</u>, 702 F.2d 102, 105 (7th Cir.), <u>cert. denied</u>, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist.  In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated.  <u>See</u>, <u>Waldridge v. American Hoechst Corp. et al.</u>, 24 F.3d 918 (7th Cir. 1994).  In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. <u>Anderson</u>, 477 U.S. at 249-251, 106 S.Ct. at 2511.  Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion.  L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  <u>Anderson</u>, 477 U.S. at 248.  Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute.  <u>Id</u>.  The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586; <u>First National Bank of Cicero v. Lewco Securities Corp.</u>, 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with

specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment

determination is essentially an inquiry as to "whether the evidence presents a sufficient disagree-

ment to require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." Anderson, 477 U.S. at 251-252.  Finally, the court notes that, "[i]t is a gratuitous

cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the

outcome is foreordained" and in such cases summary judgment is appropriate.  Mason v.

Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

The defendants[1] recite the following facts in support of their motion for summary

judgment.[2]

On May 3, 2006, the Defendant Officers were dispatched to a house on Granada Drive in

Kendallville ("Granada Residence"). (Affidavit of Officer Douglas Davis, para. 4; Affidavit of

Sergeant Michael McCann, para. 4; Affidavit of Officer Larry Richardson, para. 4; Affidavit of

Detective Lance Waters, para. 4; and Affidavit of Officer Johnny Richie, para. 4).[3]  The

Defendant Officers were advised by the dispatcher that there was a domestic disturbance

occurring at the Granada Residence. (Id., para. 5).They were also advised that someone had

---

[1]The defendants are Patrolman Douglas M. Davis, Patrolman Mike McCann, Detective Lance Waters, Sergeant Larry Richardson, Patrolman Johnny Richie, and the City of Kendallville.

[2] As the defendants are claiming immunity the facts and circumstances as perceived by the Defendant Officers are paramount in this case.  Furthermore, the existence of probable cause is determined by what the Defendant Officers knew and believed at the scene.  Leonelli's version of the facts are included as relevant.

[3] Leonelli has filed a motion to strike portions of the affidavits of defendants Davis, McCann, Richardson and Waters.  For the reasons discussed later in this order, the motion to strike will be denied.

started a fire on the front lawn of the Granada Residence.(<u>Id</u>.).

As Officer Davis approached the Granada Residence, he observed a large fire on the front lawn. (Davis Aff., para. 6). He also observed several individuals, whom he believed to be the plaintiff's neighbors, in the street near the Granada Residence. (<u>Id</u>.).

As he exited his patrol car, Officer Davis was advised by one of the individuals in the street that there was another domestic, or fight, occurring at the Granada Residence. (<u>Id</u>., para. 7). Then, as he approached the house, he observed the plaintiff standing on the front porch. (<u>Id</u>., para. 8). Officer Davis was wearing his full police uniform and identified himself as a police officer to the plaintiff. (<u>Id</u>., para. 9). He then instructed the plaintiff to come and talk to him. (<u>Id</u>.). The plaintiff responded by shaking his head, turning around and walking into the house. (<u>Id</u>.).[4]

In response, Officer Davis opened the front door and again instructed the plaintiff to come with him. (<u>Id</u>., para. 10). However, the plaintiff continued to walk away from Officer Davis, toward the interior of the house. (<u>Id</u>.). As he did, Officer Davis noticed his right hand reaching in front of his body. (<u>Id</u>.). Not knowing what he was reaching for, for his own safety and the safety of anyone who might have been in the house, Officer Davis entered the house, and escorted the plaintiff from the house. (<u>Id</u>.).

Based upon his observations, the information reported to him and the plaintiff's conduct, Officer Davis believed that there was probable cause to arrest the plaintiff for Resisting Law Enforcement. (<u>Id</u>., para.11). Officer Davis was also concerned that additional crimes had been

---

[4] Leonelli contends that either Officer Davis did not talk to him, or if he did, Leonelli did not hear him.

committed related to the reports of domestic violence and the fire on the lawn of the Granada Residence. (<u>Id</u>.).

As Sergeant McCann, the next officer to arrive at the Granada Residence, approached the Granada Residence, he also observed, and his in-car camera recorded video of, a large fire on the front lawn. (McCann Aff., paras. 6 and 12 and video attached as Exhibit "A1"). Sergeant McCann watched as Officer Davis escorted the plaintiff from the porch of the Granada Residence. (<u>Id</u>., para. 6). He walked up to Officer Davis and the plaintiff, and stood nearby while Officer Davis handcuffed the plaintiff. (<u>Id</u>., para. 7). At no time did Sergeant McCann touch the plaintiff. (<u>Id</u>.).

Prior to any of the Defendant Officers entering the Granada Residence to search for a victim, Sergeant McCann, Detective Waters and Officer Richardson were informed by one of the plaintiff's neighbors that she heard a woman screaming in the house prior to the officers' arrival.[5] (McCann Aff., para. 9; Waters Aff., para. 7; and Richardson Aff., para. 7). In addition, prior to any of the Defendant Officers entering the Granada Residence to search for a victim, each of the officers observed damage to the front door of the Granada Residence which was consistent with the door having been forced open before they arrived.[6] (Davis Aff., para. 13; McCann Aff., para. 10; Waters Aff., para. 8; Richardson Aff., para. 8; Richie Aff., para. 7).

After other police officers arrived at the scene, Officer Davis, Detective Waters, Officer Richardson and Officer Richie entered the Granada Residence for the limited purpose of

---

[5] Leonelli claims that since no one else was in the house, there could not have been anyone screaming. Nevertheless, Leonelli cannot dispute the fact that the neighbor informed the Officers that she heard a scream.

[6] Leonelli has admitted that the door frame had a small crack.

searching for victims and/or other individuals that had been involved in an altercation with the plaintiff. (Davis Aff., para. 12; Waters Aff., para. 9; Richardson Aff., para. 9; Richie Aff., para. 8). At no time did Sergeant McCann enter or conduct a search inside the Granada Residence. (McCann Aff., para. 11).  Leonelli claims that the officers performed a detailed search, including looking into cabinets, drawers and his home computer.

After looking inside the Granada Residence for other individuals, Officer Davis spoke with the plaintiff. (Davis Aff., para. 17). The plaintiff indicated that he and his wife had been involved in a verbal altercation earlier in the evening, and that she had left on foot. (Id.). Officer Davis then radioed the plaintiff's identifying information to dispatch for a warrants check. (Id., para. 18). He was later informed by dispatch that there was a no contact, protective order against the plaintiff by Jayme Leonelli, whom Officer Davis believed to be the plaintiff's wife. (Id.).  Actually, Jayme Leonelli is the plaintiff's ex-wife and Mary Leonelli is the plaintiff's current wife.  Officer Davis also believed Jayme Leonelli to be the person that had left the Granada Residence after an argument with the plaintiff. (Id.). Base upon this additional information, Officer Davis also prepared a probable cause affidavit for the plaintiff's arrest for Invasion of Privacy. (Id.).

According to the defendants, none of the Defendant Officers searched the plaintiff's computer, nor did any of the Defendant Officers search through any drawers in the Granada Residence. (Davis Aff., paras. 14-16; McCann Aff., para. 11; Waters Aff., paras. 10-12; Richardson Aff., paras. 10-12; Richie Aff., paras. 9-11). The defendants contend that the Officers only searched those areas of the Granada Residence where they believed that they might find a human body or a person hiding. (Id.)

Officer Davis is the only defendant that the plaintiff believes subjected him to false arrest and malicious prosecution. (Deposition of Bernard T. Leonelli, p. 97, lines 15-25 and p. 98, lines 1-14, attached hereto as Exhibit "F").  The plaintiff did not see any of the defendants enter his home, other than Officer Davis at the time of his arrest. (Id., p. 35, lines 15-25; p. 36, lines 1-14; p. 51, lines 22-25; and p. 52, lines 1-11). The plaintiff did not see any of the defendants search his home. (Id.).

The plaintiff has alleged in his Complaint that he was unreasonably seized/falsely arrested and maliciously prosecuted by Officers Davis and McCann.  The plaintiff also claims that the search of his home was unlawful, and that the Officers committed unlawful trespass.

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." Mustafa v. City of Chicago, 442 F.3d 544, 547 (7th Cir. 2006). Probable cause exists when "an officer reasonably believes, in light of the facts and circumstances within his knowledge at the time of the arrest, that the suspect has committed, or is committing, an offense." Thompson v. Wagner, 319 F.3d 931, 934 (7th Cir. 2003). "An officer's belief in the existence of probable cause need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." Anderer v. Jones, 385 F.3d 1043, 1049 (7th Cir. 2004). "All police need is probable cause, which is well short of certainty." Hernandez v. Sheahan, 455 F.3d 772, 775 (7th Cir. 2006). Courts evaluate probable cause based on the facts as they would have appeared to a reasonable person in the position of the arresting officer– seeing what he saw, hearing what he heard. U.S. v. Parra, 402 F.3d 752 (7th Cir. 2005).

In determining whether probable cause exists, the actual motives of the arresting officers

are irrelevant; the question is whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them. Scott v. United States, 98 S. Ct. 1717, 1723 (1978). A plaintiff's Section 1983 action must be dismissed without a trial if there is any reasonable basis to conclude that probable cause existed. Thompson v. Wagner, 319 F.3d 931, 935 (7th Cir. 2003).

The defendants claim that the facts and circumstances within Officer Davis' knowledge at the time of the plaintiff's arrest led Officer Davis to the reasonable belief that the plaintiff had committed the offense of Resisting Law Enforcement ("RLE"). Indiana Code 35-44-3-3 prohibits anyone from resisting or interfering with a law enforcement officer. The statute provides, in relevant part, as follows:

> (a)   A person who knowingly or intentionally:
>
> (1)   forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties;
>
> (2)   forcibly resists, obstructs, or interferes with the authorized service or execution of a civil or criminal process or order of a court; or
>
> (3)   flees from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop;
>
> commits resisting law enforcement, a Class A misdemeanor except as provided in subsection (b).

The Indiana Court of Appeals has held in two cases, Tawdul v. State, 720 N.E.2d 1211 (Ind. Ct. App. 1999) and Wellman v. State, 703 N.E.2d 1061 (Ind. Ct. App. 1998), that the failure to comply with a law enforcement officer's lawful request is sufficient to constitute "fleeing" under

the RLE statute.

In <u>Tawdul</u>, a police officer pulled over a vehicle in which Tawdul was a passenger. 720 N.E.2d at 1212. Tawdul and the driver exited the vehicle and then refused to return to the vehicle despite the officer's repeated requests to remain inside the vehicle. <u>Id</u>. Tawdul was arrested and convicted of RLE. <u>Id</u>.   On appeal, Tawdul argued, among other things, that he had no obligation to return to the car and that his detention was unlawful. <u>Id</u>. at 1214. The Court of Appeals held:

> We therefore conclude that Tawdul had the obligation to comply with the officer's request to return to the car for purposes of ensuring officer safety and allowing the officer to make an assessment of the situation. Because Tawdul failed to comply with this request, his arrest for resisting law enforcement is valid.

<u>Id</u>. at 1217.

In <u>Wellman</u>, a Division of Family and Children's Services worker and a police officer were at Wellman's house to investigate a report of child abuse. 703 N.E.2d at 1062. There was a discussion outside the residence between Wellman, the caseworker and the officer in which Wellman was uncooperative. <u>Id</u>. At one point, Wellman stated that he was going back inside his home. <u>Id</u>. He was told by the officer not to do so. <u>Id</u>. Nevertheless, Wellman went back inside and locked the door. <u>Id</u>. The officer demanded that Wellman open the door. Id. Wellman refused. <u>Id.</u> The officer then forced the door open, entered the home and arrested Wellman for RLE. <u>Id</u>. Wellman was charged with, and convicted of, two counts of RLE. <u>Id</u>. One of the counts was for entering the house despite the officer's order to remain outside. <u>Id</u>

On appeal, Wellman argued that the act of walking into his house did not constitute "fleeing" under the RLE statute. <u>Id</u>. at 1062-63. The Court of Appeals disagreed, and held: "for purposes of a conviction of resisting law enforcement, it was enough that Wellman disobeyed a

command to remain by walking away from Officer Hatfield into his own house and thereafter locking the door behind him." <u>Id</u>. at 1063.

In the present case, Officer Davis was confronted with a situation in which he was dispatched to the Granada Residence to investigate a report of a domestic disturbance and a fire on the front lawn. As he approached the Granada Residence, he observed a large fire on the front lawn. As he exited his patrol car, Officer Davis was advised by a neighbor that there was "another" fight occurring at the Granada Residence. Officer Davis then observed the plaintiff standing on the front porch.

While in his full police uniform, Officer Davis identified himself as a police officer to the plaintiff, and instructed the plaintiff to come and talk to him at least two times. The plaintiff refused both times, and walked away from Officer Davis both times. In light of the facts and circumstances, the defendants argue that a reasonable officer would have believed that the plaintiff had committed the offense of RLE.

In response to the defendants' evidence, Leonelli makes two arguments.  First, he claims that Officer Davis "said nothing to Dr. Leonelli until both were inside the home."  Second, he argues that a person's refusal to comply with an officer's instructions to "come here and talk to me" cannot serve as the basis for a charge of RLE.  Leonelli asserts that a police officer must use the words "stop" or "freeze" before a person is obligated to comply with the officer's instructions.

As the defendants note, however, Leonelli's first assertion, that Officer Davis said nothing to him until after he entered Leonelli's home, contradicts Leonelli's deposition testimony.  Leonelli testified, in relevant part, as follows:

11

Q.      Is it possible that you were so focused, that you didn't notice the officer pulling up?

A.      Its possible.  I didn't know anybody – I didn't look around.  I keep – I mind my own business.

Q.      Is it possible that you didn't notice the officer walking up your lawn as you're going into the house?

A.      I didn't see anybody?

Q.      But is it possible that you were just so focused that you didn't notice?

A.      I didn't notice him.

Q.      And is it possible that the officer said something to you and you just didn't hear him or you didn't notice. . .

A.      I didn't notice.

Q.      . . . before you went into the house?

A       Yes.

Q.      So it's possible?

A.      Yes.

(Leonelli Dep. at 118).

Clearly, Leonelli has acknowledged that it was possible that Officer Davis did speak to him while they were both outside of his house.  Since probable cause is determined by "the facts and circumstances within the officer's knowledge", whether Leonelli actually heard Officer Davis' instructions is irrelevant.  Thompson v. Wagner. 319 F.3d 931, 934 (7th cir. 2003).

As the defendants point out, the evidence before the court shows that Officer Davis instructed Leonelli to come to him and talk to him on at least two occasions, and, for whatever reason, Leonelli failed to comply by shaking his head and walking away.

Leonelli also attempts to distinguish the two cases cited by the defendants, <u>Tawdul v. State</u>, and <u>Wellman v. State</u>.  Leonelli claims that <u>Tawdul</u> is factually different from the case at bar because it involved the stop of a vehicle.  However, this fact does not materially distinguish <u>Tawdul</u> because <u>Tawdul</u> was cited by the defendants to show that the specific words "stop" or "freeze" are not necessary.  In <u>Tawdul</u>, the criminal defendant, Tawdul, was "asked [by the officer] to remain in the car."  720 N.E.2d at 1212.  There is no indication that the officer ever ordered Tawdul to "stop" or "freeze", yet Tawdul's conviction for RLE was upheld.  The Court of Appeals concluded that "Tawdul had the obligation to comply with the officer's request to <u>return to the car.</u>"  <u>Id</u>. at 1217 (emphasis added).  This court agrees that Leonelli has failed to demonstrate that <u>Tawdul</u> is distinguishable in any significant way.

The defendants also cited to <u>Wellman</u> to show that specific words are not required before it can be concluded that a criminal defendant has resisted law enforcement.  In <u>Wellman</u>, the arresting officer told Wellman not to go inside of his house.  703 N.E.2d at 1062.  There is no indication that the officer expressly ordered Wellman to "stop" or "freeze", yet, once again, the conviction for RLE was upheld. Thus, this court agrees that <u>Wellman</u> is not materially distinguishable.

Leonelli also argues that Officer Davis "issued no express or even implied command to 'stop' or remain outside the home."  As the defendants point out, it is uncontradicted that Officer Davis, in the light of the raging fire on Leonelli's front lawn, instructed Leonelli to "come to him and talk to him".   Clearly, these words alone would convey to any reasonable person, especially under the circumstances, the message that turning and walking away was not an appropriate response.  This court finds that under the facts and circumstances within the knowledge of

13

Officer Davis, he had probable cause to arrest Leonelli.[7]

As the Seventh Circuit has determined that as long as probable cause for arrest exists for at least one charge, evidence of probable cause for other possible charges is unnecessary. <u>Biddle v. Martin</u>, 992 F.2d 673, 677 (7th Cir. 1993).

The defendants next assert, in the alternative, that they are entitled to qualified immunity on Leonelli's unreasonable seizure/false arrest and malicious prosecution claims. "A public official's conduct is protected by qualified immunity when "the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known". <u>Cleveland-Perdue v. Brutsche</u>, 881 F.2d 427, 430 (7th Cir. 1989); <u>Meyer v. Robinson</u>, 992 F.2d 734, 738 (7th Cir. 1993). "The objective standard is designed to protect the public interest in deterrence of and compensation for an official's unlawful conduct while safeguarding the official's ability to make difficult decisions with independence and without fear of consequences." <u>Id</u>.

A two-step analysis is used to determine whether a defendant is entitled to the protections of the qualified immunity doctrine: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and (2) "[W]hether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier v. Katz</u>, 533 U.S. 194, 201-02 (2001). The inquiry as to the second step "must be undertaken in light of the specific context of the case, not as a broad

---

[7] There is no evidence that Officer McCann participated in Leonelli's arrest. Rather, he merely stood nearby while Leonelli was arrested. Therefore, Officer McCann is entitled to summary judgment on Leonelli's unreasonable search, false arrest and malicious prosecution claims.

14

general proposition." Id. at 201.

The qualified immunity inquiry acknowledges "that reasonable mistakes can be made as to the legal constraints on particular police conduct". <u>Id</u>. at 205. It is the plaintiff's burden to show "the existence of a clearly established constitutional right." <u>Kernats v. O'Sullivan</u>, 35 F.3d 1171, 1176 (7th Cir. 1994). "Viewed as a whole, the doctrine of qualified immunity erects a substantial barrier for plaintiffs, and appropriately so because qualified immunity is 'designed to shield from civil immunity all but the plainly incompetent or those who knowingly violate the law.'" Id. at 1177 (quoting <u>Donovan v. City of Milwaukee</u>, 17 F.3d 944, 952 (7th Cir. 1994)). The applicability of the qualified immunity doctrine is a question of law. <u>Hammon v. Kunard</u>, 148 F.3d 692, 695 (7th Cir. 1998). "Although the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it." <u>Mannoia v. Farrow</u>, 476 F.3d 453, 457 (7th Cir. 2007).

The defendants argue that under both prongs of the qualified immunity analysis, Officer Davis (and the other defendants) are entitled to qualified immunity.  First, Officer Davis had probable cause to arrest Leonelli and did not violate Leonelli's constitutional rights.  However, even assuming a constitutional violation occurred, the defendants argue that it would not have been clear to a reasonable officer that Officer Davis' conduct was unlawful in the situation that he confronted.

With respect to the RLE charge, clearly the plaintiff refused to comply with Officer Davis' requests. A reasonable police officer, in Officer Davis' position, would conclude that, under <u>Tawdul</u> and <u>Wellman</u>, instructing the plaintiff to come to him, and the plaintiff's refusal to comply constituted probable cause to arrest the plaintiff for RLE. Furthermore, a reasonable

officer would also have concluded that there was probable cause to arrest the plaintiff for Invasion of Privacy. Officer Davis was advised by dispatch that there was a protective order in place for Jayme Leonelli. Under the facts and circumstances present– the fire on the front lawn, the burning of a woman's clothing, the damage to the front door of the house which was consistent with the door having been kicked-in and the plaintiff's admission that he and his wife had a verbal altercation that evening– it appeared that the plaintiff violated the protective order.

Leonelli has failed to raise any issues of material fact with respect to the defendants' claim of qualified immunity. Leonelli again asserts that he did not hear Officer Davis instruct him to come to him and talk to him. However, under the probable cause standard, the knowledge of the arresting officer is what matters, and there is no evidence that Officer Davis did not reasonably believe that Leonelli heard his command. As noted, under <u>Tawdul</u> and <u>Wellman</u>, a reasonable officer would have believed that a suspect's refusal to comply with an instruction to "come to the officer and talk to him" would serve as a sufficient basis for a resisting law enforcement charge. A reasonable officer would not have believed that it was necessary to use the specific words "stop" or "freeze" prior to arresting a suspect for RLE.

Leonelli also argues that there were no exigent circumstances justifying Officer Davis' entry into his home to arrest him. As the defendants argue, however, Leonelli ignores all of the undisputed and relevant facts. Officer Davis was dispatched to a "domestic" call where clothing was burning on the front lawn of a home. At the scene, Officer Davis observed a large fire on the front lawn, and was advised by a neighbor that there was another domestic or fight occurring at the residence. As Officer Davis approached Leonelli, it was not clear what had happened or what was happening. Officer Davis could not have known whether there was a victim or a body

16

in the home.  He did not know exactly what role Leonelli had played in the extremely strange and potentially dangerous situation that he observed. To make matters worse and further raise suspicions, Leonelli shook his head, turned and walked into the house after being instructed to come to Officer Davis.  Officer Davis then opened the door of the house and entered, after again directing Leonelli to come to him and observing Leonelli reaching for something in front of him. On these undisputed facts, a reasonable officer would only have reached one conclusion – exigent circumstances existed that made it impractical to first obtain a warrant before entering Leonelli's home.

Next, the defendants argue that their search of the Granada Residence was reasonable under the exigent circumstances exception to the search warrant requirement.  "Police generally need a warrant to enter a home, but 'warrantless searches will be allowed when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant.'" United States v. Jenkins, 329 F.3d 579, 581 (7th Cir. 2003) (quoting United States v. Lenoir, 318 F.3d 725, 730 (7th Cir. 2003)). Exigent circumstances exist when "circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance." United States v. Richardson, 208 F.3d 626, 629 (7th Cir. 2000) (quoting United States v. Arch, 7 F.3d 1300, 1304 (7th Cir. 1993)). "When determining whether exigent circumstances exist, the court must analyze the situation from the perspective of the officers at the scene. Accordingly, we ask not what the police *could* have done." United States v. Marshall, 157 F.3d 477, 482 (7th Cir. 1998).

Prior to searching the Granada Residence for victims/other occupants, the Defendant

Officers had a reasonable belief, based upon the facts and circumstances, that there might be someone inside who required immediate assistance. The Defendant Officers were dispatched to the residence to investigate a report of a domestic disturbance. They observed a large fire on the front lawn. A neighbor advised Officer Davis that there was another "domestic" at the Granada Residence. Before searching the Granada Residence, the Defendant Officers observed damage to the front door of the house which was consistent with the door having been kicked-in before the police had arrived.   In addition, Sergeant McCann, Detective Waters and Officer Richardson were informed by one of the plaintiff's neighbors that she heard a woman screaming in the house prior to their arrival. Collectively, these facts would have created the belief in a reasonable officer that there were exigent circumstances that required entry to aid or protect possible victims within the Granada Residence.

Leonelli has not offered any evidence to contradict the facts submitted by the defendants establishing exigent circumstances for the warrantless search.  It is clear that the Defendant Officers were dispatched to Leonelli's home following two 911 calls.  The transcript of the 9111 calls, subimitted by Leonelli, shows that the two callers reported that Leonelli has set a fire on his front lawn.  One caller, whose name appeared on the 911 screen, reported that there was a domestic dispute at Leonelli's home.  The other caller agreed that there appeared to be an ongoing domestic dispute.  Upon arriving at the home, the Defendant Officers observed the large fire raging on Leonelli's front lawn, underneath a weeping willow tree.  The officers were informed of Leonelli's behavior and advised by a neighbor that a woman had screamed inside

the house.[8]  Written statements from four witnesses (which Leonelli submitted) indicated that

Leonelli had been <u>throwing clothes</u> on his front lawn and set them on fire.[9]  Finally, the

Defendant Officers observed damage to the front door of the home which was consistent with the

door having been forced open before they arrived.[10]   The defendants argue that all of these

uncontested facts demonstrate that there were exigent circumstances that made it impractical to

obtain a search warrant and required the Defendant Officers to search the home for a victim or

injured person.

Moreover, the Seventh Circuit has held that a 911 call of an assault, possibly in progress

by itself "can be enough to support warrantless searches under the exigent circumstances

exception particularly where . . . the caller identified himself."  <u>United States v. Jenkins</u>, 329

F.3d 579, 581 (7th Cir. 2003)(quoting <u>United States v. Richardson</u>, 208 F.3d 626, 629 (7th cir.

2000)).  In the present case, a 911 caller, identified as "Gordon", reported a domestic dispute

with a fire on the front lawn.  A subsequent 911 caller reported that the dispute was still ongoing.

Consequently, under <u>Jenkins</u>, it must be concluded that exigent circumstances were present.

Leonelli argues that the Defendant Officers should have known that there had not been a

domestic disturbance at the home because Mrs. Leonelli was not even present in the home.

---

[8]  Leonelli disputes that a woman was heard screaming.  However, Leonelli has not submitted any evidence contradicting that <u>someone reported</u> a woman screaming.  At the time of the search, the Defendant Officers had only Leonelli's seemingly self-serving statements that no one was in the house.  Clearly, the officers would have been derelict in their duties if they had relied on Leonelli's word given his behavior and the circumstances observed.

[9]  This is in direct contrast to Leonelli's testimony that he threw opaque garbage bags containing clothes on the front lawn.

[10]  Leonelli acknowledges that there was a crack in the door frame, which he characterizes as "a hairline crack".

19

Obviously, however, there was no way for the Defendant Officers to know whether Mrs. Leonelli was or was not in the home without going into the home or wasting time trying to locate her, while there may have been someone in need of assistance inside. Furthermore, Leonelli's argument assumes that Mrs. Leonelli was the only other person that could possibly have been in the home – clearly a flawed assumption.

Leonelli also claims that the Defendant Officers conducted a search of his home that included "going into cabinets, drawers, and the home computer." The Defendant Officers submitted affidavits stating that their search was limited to those areas of the home where a person or body could be found. They did not search cabinets, drawers or the home computer.

Leonelli has cited to his own affidavit in which he claims that the officers searched his cabinets, drawers and computer. He states the basis for his conclusion that Mrs. Leonelli told him the next morning that these things had been searched. The defendants have moved to strike these statements on the grounds, among others, that Leonelli admittedly does not have personal knowledge of the "facts" that he has included in this portion of his affidavit. This motion is discussed more fully later in this order.

In addition to his own affidavit, Leonelli has offered Mrs. Leonelli's deposition testimony, which indicates that when she returned home the next day, drawers were pulled out and cabinets were open. However, assuming this is true, there is no evidence that this was done by the Defendant Officers. Mrs. Leonelli testified in her deposition that when she returned home late that evening, "the front door was wide open." (M. Leonelli Dep. at 30). If the front door was open, anyone could have entered the home after the Defendant Officers left. Since Leonelli did not observe any of the Defendant Officers search anything in his home and the door was

wide open, there is no evidence that the search exceeded its proper scope.

The defendants further argue that they are entitled to qualified immunity on Leonelli's unreasonable search claim. Under both prongs of the qualified immunity analysis, the defendants claim they are entitled to qualified immunity. There were exigent circumstances requiring the search of the Granada Residence and thus the defendants did not violate Leonelli's constitutional rights. However, even assuming a constitutional violation had occurred, it would not have been clear to a reasonable officer that the search was unlawful in the situation that the defendants confronted.

Although there is a clearly established right to be free from a warrantless search of one's residence, as shown above, exigent circumstances obligated the Defendant Officers to search the Granada Residence for possible victims. Thus, it must be concluded that the defendants did not violate the plaintiff's Constitutional rights, and the defendants are entitled to qualified immunity.

Even if the exigent circumstances exception did not apply, a reasonable officer would have believed that the exception did apply. Thus, the defendants are also entitled to qualified immunity under the second prong of the analysis.

Exigent circumstances exist when "circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance." United States v. Richardson, 208 F.3d 626, 629 (7th Cir. 2000) (quoting United States v. Arch, 7 F.3d 1300, 1304 (7th Cir. 1993)).

As noted above, the Defendant Officers were dispatched to the Granada Residence to investigate a report of a domestic disturbance. They observed a large fire on the front lawn. A

21

neighbor advised at least one of the officers that there was another "domestic" at the Granada Residence. Before searching the Granada Residence, each of the Defendant Officers observed damage to the front door of the house which was consistent with the door having been kicked-in before the police had arrived. Additionally, Sergeant McCann, Detective Waters and Officer Richardson were informed by one of the plaintiff's neighbors that she heard a woman screaming in the house prior to their arrival. Collectively, these facts would have created the belief in a reasonable officer that there were exigent circumstances that required entry to aid or protect possible victims within the Granada Residence. Therefore, the defendants are entitled to qualified immunity and summary judgment on the illegal search claim.

The defendants next argue that, pursuant to Indiana Code 34-13-3-3, the Indiana Tort Claims Act, they are entitled to immunity on Leonelli's state law trespass and malicious prosecution claims. Leonelli has conceded that his trespass claims fail.

The Indiana Tort Claims Act ("ITCA") renders police officers and their governmental employers immune from liability when acting in the course of their employment if a loss results from the "adoption and enforcement of or failure to adopt or enforce a law." Indiana Code § 34-13-3-3(8). In this case, because the Defendant Officers were enforcing the law, they are immune from liability.

The case of O'Bannon v. City of Anderson, 733 N.E.2d 1 (Ind. App. 2000), is instructive. In O'Bannon, Anderson police officers were chasing an armed felon. The felon retreated into O'Bannon's home. The Anderson police officers fired shots into O'Bannon's home, searched her home and seized her momentarily in the course of arresting the felon. O'Bannon sued the city of Anderson and the police officers, alleging negligent infliction of emotional distress, trespassing

22

and illegal search and seizure. The defendants moved for summary judgment, arguing that they were entitled to immunity under Indiana Code § 34-13-3-3. The trial court granted summary judgment. The Indiana Court of Appeals affirmed. The Court of Appeals held that the officers' acts were performed while the officers effected the arrest of a fleeing dangerous suspect. The Court held that the officers were enforcing the law, and thus, the defendants were entitled to immunity. As in O'Bannon, the defendants herein were enforcing the law when the plaintiff was arrested. Therefore, the defendants are immune from liability under the ITCA on the plaintiff's malicious prosecution claims.

Leonelli continues to argue that the ITCA does not provide immunity to officers for malicious prosecution claims. However, it is clear that the ITCA provides governmental employees with immunity when enforcing the law (except for false arrest/imprisonment claims) and when initiating judicial or administrative proceedings. I.C. 34-13-3-3(6), (8).

Leonelli also argues that the defendant City of Kendallville is liable for false arrest and malicious prosecution, under a theory of respondeat superior. Respondeat superior is a theory of vicarious liability whereby an employer can be held liable for the state law torts of an employee if committed in the scope of his employment. Branham v. Celadon Trucking Serv., Inc., 744 N.E.2d 514, 525 n. 2 (Ind. Ct. App. 2001). As a result, if the employee is not liable, the employer cannot be liable either. Id. As Officer Davis is not liable for the state law claims, the claims against the City also fail.

Leonelli has asserted a claim for punitive damages against the individually named officers. Even assuming his claims otherwise survived, punitive damages are not appropriate. Punitive damages may only be assessed "when the defendant's conduct is shown to be motivated

by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Merrit v. De Los Santos, 721 F.2d 598, 601 (7th Cir. 1983). In the present case, there is no evidence that the alleged conduct of the defendants was motivated by evil motive or intent, or that their alleged conduct involved reckless or callous indifference to Leonelli's federally protected rights. Although Leonelli contends that Officer Davis acted recklessly and callously indifferent to Leonelli's federally protected right to be free from unreasonable seizure, there is absolutely no evidence to support Leonelli's arguments. Accordingly the defendants' motion for summary judgment will be granted.

### Motions to Strike

Leonelli has filed a motion to strike portions of the affidavits of Davis, McCann, Richardson and Waters. With respect to the Davis Affidavit, Leonelli seeks to strike paragraphs 7, 18, and 19. In paragraph 7 of his affidavit, Officer Davis states that he was "advised by one of the individuals in the street that there was another domestic, or fight, occurring at the Granada address." Leonelli contends that this statement is inadmissible hearsay of an unidentified third party. The defendants, however, correctly argue that the statement is not hearsay because it is not being offered to prove the truth of the matter asserted. That is, Officer Davis did not make the assertion to prove that there was a domestic, or fight, occurring at the Granada Residence when he arrived. Rather, this information is provided to support the defendants' position that, under the circumstances, the defendants acted with probable cause. Probable cause exists when "an officer reasonably believes, in light of the facts and circumstances within his knowledge at the time of the arrest, that the suspect has committed, or is committing, an offense." Thompson v. Wagner, 319 F.3d 931, 934 (7th Cir. 2003). As the statement at issue shows facts and

24

circumstances that were within the knowledge of Officer Davis and the other defendants at the time of Leonelli's arrest and prior to the search, the statement is not hearsay.

Next, Leonelli claims that paragraph 18 of the Davis Affidavit is inadmissible. This paragraph contains the statements as to Officer Davis' personal belief at the time of Leonelli's arrest that Jayme Leonelli was Leonelli's current wife and that Officer Davis thought Jayme had been an individual that had left Leonelli's home after an argument. Leonelli argues that Officer Davis' subjective belief is irrelevant to whether there was probable cause to detain, arrest or charge Leonelli with a crime.

Courts evaluate probable cause based on the facts as they would have appeared to a reasonable person in the position of the arresting officer – seeing what he saw, hearing what he heard. United States v. Parra, 402 F.3d 752, 763-64 (7th Cir. 2005). This court agrees with the defendants that Officer Davis' beliefs regarding the protective order and Jayme Leonelli may not be determinative, but they are relevant. The trier of fact must consider Officer Davis' actions based on the facts and circumstances within his knowledge at the time of the arrest. Using an objective standard, the trier of fact must determine whether Officer Davis' beliefs and his subsequent actions were reasonable. Officer Davis' beliefs at the time relevant to Leonelli's arrest have a tendency to make the existence of probable cause more likely than it would be without this evidence. Therefore, the testimony is relevant and admissible.

Leonelli objects to paragraph 19 of Officer Davis's affidavit. This paragraph contains statements as to Officer Davis' personal subjective belief and Leonelli argues that the statement is irrelevant. However, as set forth above, the facts and circumstances prior to and at the time of the arrest are relevant to the probable cause consideration. Further, the determination of whether

25

a reasonable person in the same situation would have reached the conclusions Officer Davis reached is relevant to the question of whether Officer Davis' actions were objectively reasonable.

Finally, Leonelli argues that paragraph nine of Sergeant McCann's affidavit, paragraph seven of Officer Richardson's affidavit, and paragraph seven of Detective Waters' affidavit should be struck because they contain statements that lack personal knowledge, contain conclusory statements, and inadmissible hearsay. Each of these paragraphs contain some variation of the statement, "I, and the other officers, were informed by witnesses that they had heard a woman screaming inside the home prior to our arrival." Clearly, as the defendants point out, McCann, Richardson, and Waters have personal knowledge as to what they were informed by witnesses at the scene. Further, to the extent that other officers were present when the statement was made, the affiants would have personal knowledge that the witnesses informed other officers that they heard a woman screaming inside. Thus, it is clear that the affiants have personal knowledge of the information contained in the subject paragraphs.

With respect to Leonelli's objection that the paragraphs contain conclusory statements, it is unclear how the statement is conclusory. A conclusory statement expresses "a factual inference without stating the underlying facts on which the inference is based." Black's Law Dictionary, (8th ed. 2004). The statement at issue does not contain any factual inferences, but merely recite the underlying facts.

Leonelli also objects that the statement is hearsay. However, as it is clear that the statement was not made to prove the truth of the matter asserted but to explain the facts and circumstances as they appeared to the defendants around the time of Leonelli's arrest and the

search of his residence.  This is proper evidence in determining if probable cause existed for the arrest and search.  Accordingly, Leonelli's  motion to strike will be denied in its entirety.

The defendants have also filed a motion to strike.  First, the defendants argue that paragraphs 5, 13 and 14 of Leonelli's affidavit are inadmissible for the reason that they are inconsistent with Leonelli's deposition testimony, contain statements of fact that are based upon speculation and conjecture, not personal knowledge, contain statements that are irrelevant, and/or are inadmissible hearsay.

Specifically, the defendants argue that statements in paragraph 5 of Leonelli's affidavit are inconsistent with his deposition testimony.  The last sentence of paragraph 5 of Leonelli's affidavit reads, "Officer Davis had said nothing to me up to this point and had failed to either knock, ring the doorbell, or announce himself before entering my home."  The defendants point out that during his deposition Leonelli testified that its is "possible" that Officer Davis said something to him, before he went into the house.  In response, Leonelli states that his affidavit states "what he knew based on his own physical experience of hearing no commands from Davis prior to being placed under arrest..."   While Leonelli may have meant to say he did not hear any command from Davis, that is not how his affidavit is actually worded.   The affidavit states that Davis did not say anything to Leonelli, and as this statement is contradicted by the deposition testimony that it was possible that Davis spoke to Leonelli but Leonelli did not hear him, the statement will be stricken.

Next, the defendants argue that paragraph 13 of Leonelli's affidavit is not based on personal knowledge.   Leonelli states in his affidavit that "[w]hen the Defendants searched my home, they looked in cabinets and in drawers, and searched my computer."  However, the

evidence in this case shows that Leonelli was escorted from his home and placed in a squad car before being eventually transported to the Kendallville Police Department. During his deposition, Leonelli stated that while he was in the back of the squad car he did not see anyone enter his home. (Leonelli Dep. at 36). Thus, it is clear that Leonelli does not have personal knowledge that any of the Defendants entered his home or searched in cabinets, drawers, and his computer, and the statement will be stricken.

The fourth and fifth sentences of paragraph 13 state, in pertinent part, "I know this because when I got home the next morning my wife, Mary, was home and she told me about finding her dresser drawers had been gone through and that cabinets had been gone through. Mary said she had not gone through them . . . ." The defendants argue that these statements are inadmissible hearsay. Clearly, the defendants are correct.

The last sentence of paragraph 13 reads, ""[t]o the best of my knowledge from the time that I had arrived home the evening before, up to the time that Mary returned to the home, no one had been in the home other than myself, Officer Davis, and the other officers that searched my home, while I waited in the squad car in front of my house." The defendants contend that Leonelli does not (nor does he claim to have) personal knowledge of the events that occurred at the Granada Residence from the time he was arrested on May 3, 2006 until he returned to the residence the following day. Thus, the defendants argue that the statements are based purely on speculation or conjecture, and not on Leonelli's personal knowledge. Again, as Leonelli was not at the home during the relevent time frame, his statement about what occurred or did not occur at the home is speculation and will be stricken.

Next, the defendants request that paragraph 14 of Leonelli's affidavit be stricken in its

entirety.  The first sentence of paragraph 14 states in part, "[i]n addition to having the drawers and cabinets within my home searched through. . . .", which, as noted above, must be stricken as speculative.  The first sentence of paragraph 14 goes on to state,  "I learned that the Defendants had also searched my computer because it was on when I got home the next morning it was on although I had not had it on when I was removed from the home the night before."  Again, Leonelli cannot possibly have personal knowledge of what occurred at the Granada Residence from the time he was arrested until he returned the next day.  This court agrees with the defendants that Leonelli's statement that his computer had been searched is purely speculative and not personal knowledge.

In paragraph 14, Leonelli further states that "[a]gain, the only other psersons what [sic] would have had access to the computer before my arrival home the next morning would have been the Defendants."  As set forth above, Leonelli does not have personal knowledge of what occurred at his house while he was not there.  Accordingly the statement will be stricken.

Next, in paragraph 14, Leonelli claims that "[i]n addition, Mary said she had not gotten on the computer either."  As this statement is not made by Leonelli, it may not be used to prove the truth of the matter asserted, and will be stricken.

Paragraph 14 concludes with the statement, "I was concerned about my computer having been searched because I do some of my work on my home computer and it contains confidential information."  The defendants argue that this statement is irrelevant, as Leonelli's concern about the release of information contained on his personal computer does not have the tendency to make the existence of any fact that is of consequence to the determination of this action more or less probable than without this statement.  Again, the defendants are correct and the statement

29

will be stricken.

Next, the defendants seek to strike Exhibits 4 and 5 to Leonelli's response brief.  Both of these exhibits are Orders of the Noble Superior Court that were entered in the criminal action that was initiated in connection with the events of May 3, 2006 that occurred at the Granada Residence. Exhibit 4 is an order of dismissal on the invasion of privacy charge, and Exhibit 5 is an order of "not guilty finding" as to the resisting law enforcement charge.  The defendants argue that based on well settled law, these documents are irrelevant.  Generally, evidence of acquittal in a criminal action is irrelevant and inadmissible in a civil case involving the same incident "since it constitutes a 'negative sort of conclusion lodged in a finding of failure of the prosecution to sustain the burden of proof beyond a reasonable doubt.'"  Estate of Moreland v. Dieter, 495 F.3d 747, 755 (7th Cir. 2005).

Leonelli contends that the exhibits are relevant because he has brought a malicious prosecution claim and must show that the charges imposed were at some point dismissed. Leonelli further claims that the dismissal of the criminal charges is relevant to the issue of damages he incurred due to having to defend against the charges.

As the defendants note, Leonelli does not use the exhibits to support his malicious prosecution claim, or to support his damages.  Rather, the exhibits are cited in connection with Leonelli's claim that Officer Davis did not tell him to "stop".   As the exhibits are irrelevant for that purpose, they will be stricken.

<u>Conclusion</u>

On the basis of the foregoing, the defendants' motion for summary judgment [DE 47] will be GRANTED.  Further, the plaintiff's motion to strike [DE 57] is hereby DENIED and the

defendants' motion to strike [DE 67] is hereby GRANTED.


 Entered: August 15, 2008.


<u>s/ William C.  Lee</u>
William C. Lee, Judge
United States District Court



# SUPPLEMENTAL APPENDIX

Deponent: Bernard T. Leonelli          Taken: November 8, 2007

1    answer out loud with either a yes or a no so that we

2    have a clean transcript, okay?

3  A.  Uh-huh (affirmative response).

4  Q.  Dr. Leonelli, prior to living at the Granada -- was it

5      Granada Street?  Granada Road?

6  A.  Granada Drive.

7  Q.  Granada Drive, prior to living there, where did you

8      live?

9  A.  I actually lived in Valparaiso, Indiana, with my ex-

10     wife.

11 Q.  How long have you lived on the Granada Drive address?

12     How long have you lived there?

13 A.  Since January of '04.

14 Q.  How long did you live in Valparaiso?

15 A.  I believe we moved there in, it was either '98 or '99 in

16     April of '90... -- I'm going to say '99.

17 Q.  That was until January 2004 when you moved to the

18     Granada Drive?

19 A.  Yes.

20 Q.  Prior to living in Valparaiso, where did you live?

21 A.  Hobart, Indiana.

22 Q.  How long did you live in Hobart?

23 A.  From July of '92, I believe.

24 Q.  Have you ever lived outside of the State of Indiana?

25 A.  Yes.

*Deponent: Bernard T. Leonelli*          *Taken: November 8, 2007*

| | |
|---|---|
| 1 | Q. Anywhere else outside the State of Indiana? |
| 2 | A. Uh-huh (affirmative response). I grew up in Pittsburgh, |
| 3 | which is where I went back to do my internship. I was |
| 4 | born there and I lived there until 1980. I left to go |
| 5 | to Case Western to continue my bachelor's degree. So |
| 6 | there you have my life's history and my ability to |
| 7 | recall backwards. |
| 8 | Q. All right. |
| 9 | A. What is your date of birth? |
| 10 | A. 1/19/59. |
| 11 | Q. And your Social Security number? |
| 12 | A. 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. |
| 13 | Q. Are you currently married? |
| 14 | A. Yes. |
| 15 | Q. What's the name of your spouse? |
| 16 | A. Mary Leonelli. |
| 17 | Q. And how long have you been married to Mary Leonelli? |
| 18 | A. Since December 30, '04. |
| 19 | Q. Have you been married to anyone else? |
| 20 | A. Yes. |
| 21 | Q. Who else have you been married to? |
| 22 | A. Jamie D. Leonelli, my ex-spouse. |
| 23 | Q. What dates were you married to her? |
| 24 | A. March of '89, and I believe it was finalized in October |
| 25 | of '04. March 26, '89 until October, I think we used |

PENGAD • 1 800-631-6989 • www.penpad.com

LASER BOND FORM A

*Deponent: Bernard T. Leonelli*          *Taken: November 8, 2007*

1  A.  No, I didn't.  Again, I really don't look up.  When I go

2      outside, I stay focused on....  I don't really want to

3      know my neighbors.  I mean, I'm not a....  I like the

4      people around me, but I don't want to get involved.  I

5      want peace, believe it or not, I really do.

6  Q.  And how long after you lit the clothes on fire, did

7      Officer Davis show up at your door?

8  A.  Fifteen (15), twenty (20) minutes.

9  Q.  So, the clothes were burning for fifteen (15) or twenty

10     (20) minutes?

11  A.  I think so.  I mean, if any, that's an ordinance

12     violation; that's no reason to arrest anybody.  As

13     stupid as it is.

14  Q.  Did Officer Davis ever say to you, do you recall him

15     saying to you, "Come here, I need to talk to you"?

16  A.  No.

17  Q.  He just walked into your house and placed you under

18     arrest?

19  A.  [Nonverbal response.]

20  Q.  Yes?

21  A.  Yes.

22  Q.  You didn't see Officer Davis enter your house after he

23     arrested you, correct?

24  A.  Correct.

25  Q.  You didn't see Officer Richardson enter your house after

1      it was because there was a hearing, a preliminary

2      hearing, and I think Attorney Yoder made a motion and

3      that was dismissed.  But it should've been dismissed

4      much earlier.

5   Q.  Do you believe that at any point you had been guilty of

6      invasion of privacy?

7   A.  Oh, absolutely not.  They thought that was the house.

8      They thought it was supposed to be Noble County, but

9      that was a Porter County Protective Order.  That's what

10      the charge was for.

11  Q.  At any time were you guilty of resisting law

12      enforcement?

13  A.  Not at all.

14  Q.  Did you ever give Officer Davis permission to enter into

15      your home?

16  A.  No.

17  Q.  Did you ever give any officer permission to enter into

18      your home on May 3, 2006?

19  A.  No.

20  Q.  Did any of them ask you permission to enter into your

21      home?

22  A.  No.

23  Q.  Or did any of them ever give you any permission to

24      search through your home?

25  A.  No.

4

PO-0105    Approved   07-01-02
           Revised    07-23-04

STATE OF INDIANA ) SS:    IN THE _Superior_ COURT _2_
COUNTY OF _Porter_ )      ( _____ DIVISION, ROOM ____ )

CASE NO. _64 003 - 0607- PO- 733 T.O.02_

**FILED**
IN OPEN COURT
FEB 16 2008
_Katherine K. Fadin_
MAG PORTER SUPERIOR COURT

_Jayme O. Leoniss_
Petitioner
   vs.
_Bernard T. Leoniss_
Respondent

_Amended_    **EX PARTE ORDER FOR PROTECTION**

The Court, having reviewed the Petition, and having heard testimony, now issues this Ex Parte Order for Protection.

## FINDINGS

The Court, having reviewed the Petition and/or hearing testimony, now makes the following Findings:

a.  The Petitioner has shown, by a preponderance of the evidence, that domestic or family violence, stalking, or a sex offense has occurred sufficient to justify the issuance of this Order.
b.  The Respondent represents a credible threat to the safety of the Petitioner or a member of the Petitioner's household.
c.  The following relief is necessary to bring about a cessation of the violence or the threat of violence.

## ORDER
(Check all applicable relief ordered)

IDACS Codes

X 1.  The Respondent is hereby enjoined from threatening to commit or committing acts    01 -
of domestic or family violence, stalking, or a sex offense against the Petitioner and    Petitioner
the following designated family or household members, if any:                            02 - Others
_____
_____

X 2.  The Respondent is prohibited from harassing, annoying, telephoning, contacting,
or directly or indirectly communicating with the Petitioner, _except for court ordered_
   3.  The Respondent shall be removed and excluded from the Petitioner's residence.    _visitation_    03

**RECEIVED**
FEB 21 2006
CLERK
PORTER CIRCUIT/SUPERIOR COURT

S

## LEONELLI TRANSCRIPT OF 911 CALL

KPD:  911 Emergency

CALLER:     Hi, I'm calling about my neighbor.  I think there is a domestic dispute and he is
            burning everything in his front yard.

KPD:  Burning?

CALLER:     He is throwing things out of his house and burning it in his front yard.

KPD:  Do you know his address, or?

CALLER:     Is this Gordon?

KPD:  Yeah, I

CALLER:     This is  *cannot understand name*

KPD:  Yeah, I see it on the 911 screen.  Which, they'll obviously see it if they go to your address.

CALLER:     Oh yea, if they go to 609, it's right here on the other side of the cull-de-sac.  He's
            throwing everything in his front yard and it's all on fire.

KPD:  I'll get some guys heading that way. Thanks, Bye

CALLER:     Bye.

KPD:  Attention all Kendallville City Units.  I have a possible domestic, possible domestic in the
      area of 609 Granada.  It's going to be in the cull-de-sac area of 609 Granada Drive, CP0911
      advised the husband is throwing things out into the front yard setting them on fire.  OK
      *unintelligible*

UNIT: 13 is in route.

KPD:  OK 13.

UNIT: *unintelligible target alley (??)*

KPD:  K-29.

UNIT: K-15 Kendallville.

6

KPD:  K-17.

UNIT: In route.

KPD:  K-3

UNIT: In route.

KPD:  K-7

KPD:  911 Emergency.

CALLER:    Hi there. Um, I got a, my neighbor has fire going in his yard

KPD:  Yea

CALLER:    And is like throwing clothes on it.

KPD:  Yea, we a, it's a domestic apparently and

CALLER:    That's what I thought.

KPD:  Yea.

CALLER:    I just wanted to make sure somebody knew about it.

KPD:  Yea, is he still throwing things on it?

CALLER:    Yea.

KPD:  All right, thank you.

CALLER:    Unha, thank you.

KPD:  Bye, Bye.

UNIT: Background noise, unintelligible

KPD:  The CP was calling from 609 Granada, she advises it is in the cull de sac across from her, You should be able to see it.

KPD:  Also just had another CP call and advise that it is still going on.

7

KPD:  Second caller was calling from 2112 Logan Court.

UNIT: K-3 right in there, should be right there.

UNIT: *Unintelligible*

KFD:  Unit one.

UNIT: Unit one..as soon as we pull in up here should be a couple blocks or that block.

UNIT: OK, I'm clear, I'm right by you.

UNIT: Kendallville 13 and Avilla 223

KPD:  K-15, Avilla 1

KPD:  Kendallville 13 and Fire Department in route, we have a large....*unintelligible*

KFD/KPD:    Check 487

UNIT: L50 in route.

KPD:  K-15

UNIT: Kendallville 16

KPD:  K-16

KFD:  Um I can see, I can head out

KPD:  Go ahead and start that way.

KFD:  710 23

KPD:  OK,  710 23

UNIT: Kendallville 10, pick *unintelligible*

KPD:  Your discretion.  Everybody else is in route and have three units there so far.

UNIT: Kendallville 13 information.

KPD:  K-13

*8*

UNIT: We got the fire out with the fire extinguisher and got the subject in custody. Anybody else on the way can slow down, we need just one fire truck out here, maybe a grass truck. 423

KPD: Fire on grass truck to continue all other place units in route continue sluff(?). Also, prior one in custody, fire out.

KFD: Attention all Kendallville firemen; all Kendallville firemen; you have a 10-70, 270 in the 600 block of Granada Drive, 600 block of Granada Drive involving several items in that yard close to a residence. Be a first page to unit 621-37.

UNIT: In route to 600 Block Granada Drive

KFD: QD 907 (??)

KFD: Attention all Kendallville firemen; all Kendallville firemen; facility at 1013 fire is out. Have grass control; have grass truck continue. Grass truck only continue to the scene 600 block Granada Drive. Facility 1013 at 62138.

UNIT: Truck 1013 clear and returning to service

KFD: *unintelligible*

UNIT: Squad 13 in route

KFD: Squad 13.

UNIT: Engine 12 on the scene

KPD: Engine 12 on the scene, QD996 2139.

UNIT: O-1 Squad 13.

UNIT: L 15 on 1023 with everybody

KFD: OK 15

UNIT: Station 2 on center

KFD: Station 2

KPD: Squad 13, if you haven't already, please come in off Kammerer Road and proceed .

UNIT: I'm just now at Allen Chapel

*9*

UNIT: Dispatch Squad 13 on scene

KFD: Squad 13

UNIT: *unintelligible*

UNIT: Kendallville on scene can you advise myself and 18 in route?

KDF/KPD:    K-3 in Kendallville

UNIT:      3

KPD:       K-16 is inquiring if you need his or K teams assistance?

UNIT:      Negative, other than if they want to come on reference calls, we have enough people here.

KPD:       K-16 your clear.

UNIT:      I'm clear.

UNIT:      Kendallville 7-28.

KPD:       K-7

UNIT:      K-7  57 C-Charles 7846; 57 C-Charles 7846 on five issue.

KPD:       *unintelligible* Class    ct and by

KPD:       K-7 10-28 57 C-Charles 7846 ; Bernard Leonelli on a grey 2002 Ford four-door expires June 30, 2006; also did show a protective order when I ran the 28.

UNIT:      Who are the Petitioner and Respondent on the Protective Order?

KPD:       Checking that.

KPD:       Believe the protected person is going to be a Jamie Leonelli. Jamie Leonelli, appears to be out of Porter County.

UNIT:      Clear

UNIT:      K 3 9 requests 10-29 by *unintelligible*  ha, at  Lot's

*10*

KPD:        Go ahead.

UNIT:       Last name Leonelli, L-E-O-N-E-L-L-I, first name Bernard, middle initial T-Tom; date of birth 1-19-59; 1-19-59.

KPD:        stand by

UNIT:       Kendallville Dispatch car 102

UNIT:       Unit calling Kendallville Dispatch
KPD:   Despatch fire 102 all ---and service working out...
                                fire work.

KFD:   KD996-2148

KPD:   Kendallville 1029 search simulating

UNIT:   Kendallville *unintelligible*

UNIT:   Kendallville  unintelligible

KPD?KFD:    Kendallville

UNIT:   Also K 3 has got your package from N 45

KPD:   Ok Kendallville 1

KPD:   Kendallville Police

UNIT:   Hey, can you call over to Hobart and see if there is a ____ and see if this guy still works for them?

KPD:   Call Hobart?

UNIT:       Yeah, he's supposedly their psychologist.

KPD:   OK

UNIT:       And don't put it over the air because he is in the car.

KPD:   Where's Hobart?

UNIT:   It's over by Chicago. Porter County I believe.

11

KPD: We need to call the P.D.? Or

UNIT: Yeah, we can call the P.D. and see if he is still affiliated with them.

KPD: OK, we can do that.

UNIT: Thank You.

KPD: I'll give you a call back on cell

UNIT: OK, Bye.

KPD: Bye.

Telephone Dial: You have reached the Porter County Sheriff Department. If you are trying to reach any other government office, please call back after 8:30. Our normal business hours are Monday through Friday 8:00 a.m. to 4:00 p.m. If you know your parties' extension number, you may dial it at any time. To dial by name, press 8; for the dispatch center or to contact an officer, press 1; for the jail....NUMBER PRESSED..RINGING..Porter County Dispatch.

KPD: Yes, hi. This is Kendallville Police Department calling. You guys have a protection order in your computer on a Bernard Leonelli. Are you guys familiar with him at all?

POLICE:    Nope

KPD: Sound familiar

POLICE:    No, never heard of him.

KPD: Is Hobart in your area?

POLICE:    No, that's Lake County.

KPD: That's Lake county?

POLICE:    Yea.

KPD: OK, Alright thank you.

POLICE:    Ok, Bye.

Telephone Dialing:    Welcome to the Hobart Police Department. For all emergency and non-emergency calls press 1 for the communication center. For the investigation division...NUMBER

12

PRESSED. One moment please.

HOBART PD:        Radio Eric

KPD:  Hi, this is Kendallville Police Department calling.

HOBART PD:        Yes.

KPD:  We have a gentleman by the name of Bernard Leonelli, are you guys familiar with him at all?  Is he a psychiatrist there or something?  A department psychiatrist?

HOBART PD:        Bernard Leonelli?

KPD:  Yes. L-E-O-N-E-L-L-I.
HOBART PD:        I don't know the name.

KPD:  You've never heard the name.

HOBART PD:        I've only, I haven't been here that long to

KPD:  Oh. OK

HOBART PD:        _to someone else in his office "Have you heard of Bernard Leonelli?"  Who is he?

HOBART PD:        Why, what's going on?

KPD:  Um, well apparently he has been involved in a domestic situation and our officer at the scene, he's stating that he is a psychiatrist there. Um, through your department possibly.

HOBART PD:        Ok, hold on.  (To someone else in there office: "Is he a psychiatrist in our department?")  I'm going to put you on hold and let you talk to the other dispatcher, she has been here a lot longer.

KPD:  OK.  They know him.  Hobart is not any where near though this place, Porter County.
(Someone in background "I wonder if it would just to be easier to....?)
Well, that's what I'm thinking here in just a minute.  He's 8375 right?  Gordon, he's 349-8375, right?  OK, that's what I will do here in just a minute.  First, I'll find out what he's....He's only been there a few weeks.

HOBART PD:        This is Chief Fnedecor, may I help you?

KPD:  Yes, Hi, this is Kendallville Police Department.

13

HOBART PD:    Yeah, how you doing?

KPD:  Good.  Are you familiar with this Bernard gentleman?

HOBART PD:    Yes, yes

KPD:  Ok, what's the deal with him?

HOBART PD:    He does serve as our pension psychologist, uh psychiatrist, whatever you want to call him, for new hirees as far as you, know..

KPD:  The psych evaluation.

HOBART PD:    Yeah.

KPD:  OK

HOBART PD:    Can I personally speak of him, No, I don't know him that well that I can give you any kind of personal background.  Is this involving his wife, or ex-wife?

KPD:  Apparently.

HOBART PD:    Ok, they have had, We have had to respond to domestic type of problems previously involving him and his ex-wife.

KPD:  OK

HOBART PD:    So, this is not new, if it is a domestic between the two of them.

KPD:  OK

HOBART PD:    We responded to several type of these calls.

KPD:  Do you know the ex-wife's name?  I mean are they together now that you know of?

HOBART PD:    You know what, I don't know.  She came to me one time about some of the problems she was having with her ex about custody transfers or something like that, but I don't remember her name off the top of my head.

KPD:  Well, apparently he has thrown a lot of items out of the house and set them all on fire and now we're trying to figure out...I think they are wanting to know if he

HOBART PD:    His stability?

KPD:  Yeah.

HOBART PD:   Chuckles

KPD:  Can you hold on just a minute?

HOBART PD: Sure.

KPD:  Let me get the officer on the phone and see if he would like to talk to you.

HOBART PD:      No problem.

KPD:  Ok Kendallville

HOBART PD :      Hello?

KPD:  Yeah, just a minute.  I think, I'm through.

HOBART PD:      Right

KPD:  Ok 3, would you like to talk to Hobart on TX?

KPD:  Stand by and I'll transfer them sir.

KPD:  OK, I'm go have you talk to Sgt.  He would like to talk to you about it.

HOBART PD:      That's fine

UNIT: Kendallville 15.

DIALING..RINGING        says officers name...I have the other police department on the phone,
                        Hobart,

UNIT: Yeah.

KPD:  and they said that what he does is he serves as their pension psychologist, you know when
      they do psych evaluations on new hires?

UNIT: Yeah.

KPD:  he's says that they have had tons of domestics before involving him, were you wanting
      anything else from them, or

*15*

UNIT:  We were curious, um, you might, can they be transferred?

KPD:  I can transfer him to you if you like.

UNIT:  When I left 3 is still out there, I don't know if he is wanting to talk to them or not, they were curious as to whether or not in fact, he still works out there.

KPD:  Well,

UNIT:  because of all the problems we have had.

KPD:  Yeah, well...apparently, they just use him for new hireees and they do psych evaluations, but Do you want me to check with 3 first?

UNIT:  Yeah, is K-11 up there?

KPD:  Who?

UNIT:  K-11.

DIALING..RINGING: KPD: Johnny (?) I have the other police department on the phone, Hobart.

UNIT:  Yeah

KPD:  He's sitting right here.

UNIT:  He's Code 5

KPD:  Johnny is Code 5 for you.

KPD:  OK 3 Kendallville; OK 3, would you like to talk to Hobart on TX?

GARBLED....

KPD:  Stand by while I transfer them through.

UNIT:  Kendallville 1015-42

KPD:  OK K-15

DIAL TONE, DIALING, RINGING:

KPD:  Detective Waters

Page 11 of 14

16

POLICE:    Hey, how you doing, this is Chief ---- from Hobart. How you doing?

KPD:  How are you sir.

HOBART:    Good, I hear you are dealing with Dr. Leonelli.

KPD:  Yes, I am

HOBART:    OK, I can't tell you a whole lot about his personal life. He served as the, basically as the psych eval for PERF,

KPD  UN huh

HOBART:    for new hirees. I know that we had situations with him and his wife, or ex-wife I guess she is, in the past where we have been called to locations, I think including his office where there has been supposedly domestic disturbances involving the transfer of the child and those types of things.

KPD:  OK

HOBART:    I don't think we have had anything like this, I heard he was throwing furniture out or something?

KPD:  All of her clothes and he set them on fire out in the front yard.

HOBART:    I don't recall having anything that drastic, but we have had some situations that were..uh, domestic related type thinks, I don't know him really personally, I'm not sure that I would recognize him if I saw him on the street, but

KPD:  OK

HOBART:    He is the one that does do the psych evals for the hirees. UH, but I know his wife one time came to visit me and she was complaining about, well of course, she was complaining of his, I guess you would say in her eyes, instability or stubbornness dealing with how he was talking to the kid and trying to supposedly influence the kid in negative ways towards, I think her and that kind of thing.  You know it is one of those things you know, they have split up and are feuding back and forth, but not to the point he is throwing the furniture out and putting fire to her clothes..chuckle

KPD:  Chuckle, yea well this is actually with his current wife, not his....

HOBART:    OK, Alright, well then we haven't had anything with that. That's why when I heard you know, Kendallville, I'm thinking this I though his wife lived over in Porter

17

County or somewhere..

KPD:  Yes, well as far as I know, the one this is on is Jamie and this one is a Mary

HOBART:    Ok, so this must be a totally different one then.

KPD:  OK

HOBART:    Well

KPD:  Well, I appreciate your calling.

HOBART:    No problem. I hope things work out.

KPD:  Yeah, he's going to be charged with resisting over here So,

HOBART:    Yeah, well hey. You know that might be something for us to look at maybe taking him off the pension board.

KPD:  Yeah, I don't want to suggest...

HOBART:    No, No, I know that, Let me ask you this. Is there any chance of you faxing me a copy of the arrest report to my attention?

KPD:  Yea, I can do that, just let me get a pen out of my desk...

HOBART:    OK

KPD:  Ok, go ahead and give me your fax

HOBART:    It is of course 219/942-9806

KPD:  OK

HOBART:    and my name is Bnedecor. I happened to be working late in my office when the dispatcher called and said it was involving Dr. Leonelli and I said I better go ahead and take the call.

KPD:  Well, I appreciate it

HOBART:    No problem

KPD:  And I'll fax that over when the officer gets it done.

HOBART:    Thank you sir

18

KPD:  Thank you and goodbye.

UNIT: Hello K-29

KPD:  K-29

UNIT: *unintelligible* ..10-2

KPD:  K-29

UNIT: Kendallville 3

UNIT: K-3

UNIT: In route 16 with package

KPD:  K-3

UNIT: *unintelligible*

KPD:  K-7

END OF TAPE.

19

ase#: _____          **VOLUNTARY STATEMENT**          Date: 5 3 0 6

Iame: GREG MILLER          DOB: 3.3.66    SSN: 3008-84-3176
Address: 2107 Logan Court KenDallville In    TEL#: 260.347.9222

MY NEighbors Called me To Tell me That
There was a Fire In The NeighBors yard
Walked ouT To End of DRIveway and Seen
2 Firm In FronT yard Walked In FronT of
yard and Seen a pile of Cloths on fire Under
The Tree Then saw Some one I Thought
Man Cloths out of FronT Door and for at
This Time The Palie arrived

Signature: Greg Miller   G M.

ATTENTION...
It is a Misdemeanor to knowingly and intentionally give false information
regarding the commission of a crime or an official investigation.

20

ase#: _____                VOLUNTARY STATEMENT                Date: _5-3-06_

ame: _AJ Risedorph_____  DOB: _4-11-87___  SSN: _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_

ddress: _604 Granada Drive, Kendallville, IN 46755_   TEL#: _(260)347-5845_

My brother and I pulled into Granada Dr." at approximately
9:30. My brother, Ryan, said that he saw the guy throw clothing
out onto the yard. When we got to my house at 604 Granada.
I saw the clothes in the yard, too. Ryan went into the house
and I emptied to get things out of my car. I then saw him (the man)
exit the house and the pile of clothes then caught fire.
- The man exited the house numerous more times tossing more clothes.

Signature: _AJ_____

ATTENTION...

It is a Misdemeanor to knowingly and intentionally give false information
regarding the commission of a crime or an official investigation.

21

ise#: _____                    **VOLUNTARY STATEMENT**                Date: _5-3-06_

ame: _Ryan Bosdorph_ _____ DOB: _10/30/89_ ___ SSN: _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_
address: _609 Granada Dr_ _____ TEL#: _(260) 347-5845_

Me and my brother AJ were pulling up to
ur house at approx. 9:30pm. I was in the
assenger seat of car, and noticed a man
tossing out clothes and clothes already tossed
xit onto the front yard.

Signature: _Ryan Bosdorph_

ATTENTION...
It is a Misdemeanor to knowingly and intentionally give false information
regarding the commission of a crime or an official investigation.

22

VOLUNTARY STATEMENT

se#: _____    Date: 5-3-06

me: Stacey Snyder    DOB: 1-25-69    SSN: 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
ldress: 2100 Logan St, Kendallville    TEL#: 347-2292

I witnessed Bernard throwing clothing in the front
lawn, then throwing a cup (sippial) over the clothes
& set them on fire. The 1st time up, I thought, was
going to set the weeping willow tree on fire
my 1st thought was the house was on fire & to
call the fire department I walked across the
street to see exactly what was on fire when
I witnessed Bernard throwing the clothes out
of the cup of liquid to ignite the fire. We seen
heard the sirens & police were there shortly
thereafter.

Signature Stacey Snyder

ATTENTION...
is a Misdemeanor to knowingly and intentionally give false information
garding the commission of a crime or an official investigation.

23

Douglas M. Davis      March 28, 2008

[Page 6]

1   front of the residence at that time or on the side

2   or in the back of the residence?

3       **A      On the side, I would say.**

4       Q   I see.  And then when you continued

5   walking towards the residence, did you say anything

6   in particular?

7       **A      As I was walking toward?**

8       Q   Yes.  Did you say anything?

9       **A   I did.  I asked a male subject standing on**

10  **the porch to come to my direction.**

11      Q   And how far away were you from the porch

12  at the time you were talking to Mr. Miller, just

13  roughly?

14      **A      I would say --**

15          **MR. WILLIAMS: For clarification, did you**

16  **mean Mr. Miller or did you mean Mr. Leonelli?**

17      Q   Miller.

18      **A      When I was talking to Mr. Miller?**

19      Q   Yes.

20      **A      I was within me to you, probably, two or**

21  **three feet.**

22      Q   From the porch?

23      **A      No, when I was talking to him, as I was**

24  **walking up to the residence, he was at the side, and**

b4fbecb4-e74d-49e0-8127-1ec75c6afb91

24

[Page 7]

1    he approached me, and he was probably from me to you

2    within two or three feet.

3        Q    But when you were talking to Mr. Miller,

4    how far were you from the front porch of the house?

5        A    Approximately ten to 15 feet or better.  I

6    really can't recall.  I don't know the exact

7    measurement.

8        Q    Okay.  And you said you had seen a male

9    subject on the front porch and you asked the subject

10   to come talk to you.

11           What did the subject do?

12       A    He didn't acknowledge that I was there.

13       Q    Were you in uniform at the time?

14       A    That is correct.

15       Q    And then what did he do?

16       A    I asked him again.  He then began to nod

17   his head back and forth.

18       Q    Back and forth, up and down, sideways?

19       A    As in a "no."

20       Q    And then what did he do?

21       A    He then turned around, opened the storm

22   door of the front door of the residence and then

23   entered the residence.

24       Q    Roughly how far were you from the front

Douglas M. Davis    March 28, 2008

[Page 8]

1  door at that point?

2      **A      When he opened the door?**

3      Q      Correct.

4      **A      Probably five feet, maybe, five or six**

5  **feet.**

6      Q      Did he say anything to you prior to

7  entering the house?

8      **A      No.**

9      Q      And after he entered the house, what did

10  you do?

11      **A      I opened the storm door and entered the**

12  **residence.**

13      Q      And when you entered the residence, did

14  you say anything to the subject prior to actually

15  entering?

16      **A      When I opened the door, yes.  I told the**

17  **male subject to come to my direction again.**

18      Q      Do you remember specifically what you said

19  or how you said it?

20      **A      I don't.  Not specifically.  I can't**

21  **recall exactly what I said.**

22      Q      And was this subject Dr. Leonelli?

23      **A      Later it was determined it was Dr.**

24  **Leonelli.**

Douglas M. Davis          March 28, 2008

[Page 9]

1  Q  Okay.  So it was Dr. Leonelli.

2  **A**  **Yes.**

3  Q  After you were at the door and told Dr.

4 Leonelli to come towards you again, what was the

5 next thing you did?

6  **A**  **I went in after Dr. Leonelli.**

7  Q  What did you do when you went in after

8 him?

9  **A**  **I placed both hands behind him, as in a**

10 **double arm bar, and pulled him out of the residence.**

11  Q  How far into the house was he when you did

12 that?

13  **A**  **Approximately ten feet.**

14  Q  Why at that point did you pull him out of

15 the house?

16  **A**  **For my safety and the safety of others,**

17 **other potential victims that might be in the**

18 **residence.**

19  Q  I see.  Was he trying to run away from you

20 when you pulled him out?

21  **A**  **No.  He was walking away.**

22  Q  And isn't it true that you, at some point,

23 determined that he wasn't armed?

24  **A**  **That is correct.**







A






B

| STATE OF INDIANA | ) | IN NOBLE SUPERIOR II COURT |
| COUNTY OF NOBLE | ) SS: <br> ) | CAUSE NO. |

| STATE OF INDIANA | ) |
| | ) |
| vs. | ) |
| | ) |
| BERNARD T. LEONELLI | ) |
| DOB: 01-19-1959 | ) |
| SSN:xxx-xx-5945 | ) |

### INFORMATION FOR INVASION OF PRIVACY
### Class A Misdemeanor, I.C. 35-46-1-15.1

Douglas M. Davis, being duly sworn upon oath to tell the truth, says that on or about the 3rd day of May, 2006, at: (location) 613 Granada Dr. Kendallville, In. 46755, County of Noble and State of Indiana, one BERNARD T. LEONELLI of 613 Granada Dr. did knowingly or intentionally violate a: (state type of order violated) (see list in I.C. 35-46-1-15.1 (a)(1-10)) Protective order violation, by: being at this property against conditions of his protective order. All of which is contrary to the form of the statute in such cases provided, and against the peace and dignity of the State of Indiana.

I hereby affirm under the penalties of perjury that the foregoing representations are true and correct to the best of my knowledge.

Dated on this 3rd day of May, 2006.

Douglas M. Davis 3249

- 1 -

30

## STATE'S WITNESS LIST

APPROVED BY ME:      _____
                            (Deputy) Prosecuting Attorney

31

STATE OF INDIANA    )      IN NOBLE SUPERIOR II COURT
                   ) SS:
COUNTY OF NOBLE    )      CAUSE NO.

STATE OF INDIANA      )
                     )
vs.                 )
                     )
BERNARD T. LEONELLI )
DOB:01-19-1959    )
SSN:xxx-xx-5945    )

### AFFIDAVIT FOR PROBABLE CAUSE
### INVASION OF PRIVACY, Class A Misdemeanor

The undersigned states that he/she believes and has good cause to believe that:

1. The undersigned is duly sworn and acting law enforcement officer with the Kendallville Police Department.

2. On or about the 3rd day of May , 2006, while engaged in the execution of his/her official duties, the undersigned encountered (name victim) Jayme D. Leonelli, who informed the undersigned of the following.

3. The victim informed the undersigned that a (list type of order being violated): Protective Order, was in place, which prohibited (Defendant) BERNARD T. LEONELLI, from doing: (state restricted conduct from order) no contact protective order.

4. A copy of the order described above (☒) IS or (☐) IS NOT attached to this affidavit. The order was issued by the (name court issuing order) Porter Superior 3 Court.

32

5. Victim further advised that on the above date at approximately (time) 9:34 PM, Defendant engaged in the following conduct: <u>was on the property which is in violation of the protective order.</u>

6. The undersigned believes the statements of (victim) <u>Jayme D. Leonelli</u> to be truthful and accurate because he/she is the victim of an apparent crime, and has no motive to lie.

Douglas M. Davis 3249

I hereby affirm under the penalties of perjury that the foregoing representations are true and correct to the best of my knowledge.

Dated on this 3rd day of May, 2006.

Douglas M. Davis 3249

33

| PAGE #1 | OFFENSE | | CASE NO. |
|---|---|---|---|
| | Invasion Of Privacy | 35-46-1-15.1 | 06050317 |

## DETAILS OF INVESTIGATION

On 5-3-2006 at approximately 9:34 pm I, officer Douglas M. Davis dressed in full uniform, along with all Kendallville city police units was dispatched to a possible civil disturbance at 613 Granada Dr.

Upon my arrival I witnessed a very large fire burning in the front yard at 613 Granada Dr.. I exited my police vehicle and started approaching the residence when a neighbor approached and advised that there is another domestic that is occuring at 613 Granada Dr.. I then continued approaching the front of the residence when I observed a male subject standing outside of the residence on the front porch. As I arrived on the sidewalk leading to the front porch I observed the male subject start to enter the residence after seeing that I was there at which time I asked the male subject to come with me so we could talk. The male subject shook his head and continued inside the residence. I then opened the front door and again asked the male subject to come outside. The male subject continued to walk away from me at which time he was holding something in his right hand then started to reach around the front of his body. I then entered the residence and grabbed both arms of the male subject and pulled him outside away from where he had started a fire. I then placed handcuffs on the male subject to detain him at which time I searched him for weapons.

While placing handcuffs on the male subject the other police units arrived at the scene. I then placed the male subject in the back seat of my police vehicle. Myself along with the other police units entered the house to search for any other subject(s) involved. The entire house was searched and did not discover anybody in the residence or on the premises. There was prior damage to the front door where it had been kicked open to gain entry possibly by Mr. Leonelli. After searching the residence I along with Detective Waters asked the male subject for identification. The male subject produced a drivers license which revealed the male subject as Bernard T Leonelli with a date of birth of 1-19-1959. Mr. Leonelli advised that he and his wife were involved in a verbal altercation prior in the evening. Mr. Leonelli then advised that she left a vehicle and was last seen on foot somewhere on Main St. in Kendallville. I then radioed dispatch to request a drivers license query on Mr. Leonelli to inquire if Mr. Leonelli had any warrants for his arrest. I was also informed by dispatch that there is a no contact protective order against Mr. Leonelli by Jayme D Leonelli.

Marshall Wills from the Avilla Police Department arrived to assist. Marshall Wills recieved witness statements from four individuals to whom are neighbors' of Mr. Leonelli. After securing the residence I transported Mr. Leonelli to the Kendallville Police Department where he was booked in and placed in a holding cell. Mr. Leaonelli was charged with invasion of privacy and resisting law enforcement and later transported to the Noble County Jail.

Attachments : Drivers license query, four witness statements, copy of drivers license, probable cause and information affidavits,copy of protective order and copy of criminal history.

PLAN OF ACTION : Subject cleared by arrest and charged with Invasion of Privacy
(35-46-1-15.1) Class A misd. and Resisting Law Enforcement (35-44-3-3) Class A Misd.

| OFFICER | DATE | REVIEWED BY: |
|---|---|---|
| Ptl. Douglas M. Davis | 7/11/06 | |

34

| 6-14-2007 | DOMESTIC | | 06050317 |
|---|---|---|---|
| **VICTIM**<br>**STATE OF INDIANA** | | DATE OF OCCURANCE<br>5/3/06 | INVESTIGATING OFFICER<br>SGT. MIKE MCCANN |

## NARRATIVE

On 5-3-2006 I was dispatched to a domestic fight at 613 Granada in Arvada Hills subdivision. Dispatch stated that a male & female were fighting and that the male was throwing clothes in the front yard. Dispatch then stated the male was setting the clothes on fire in the front yard.

·Upon my arrival there was a large fire in the front yard op 613 Granada. I requested that the fire department be dispatched. I observed Ptl. Doug Davis walking across the front yard with a male subject. Davis had the male in a arm restraint and the male was arguing with Davis. I approached as Davis was handcuffing the male (later Identified as Bernard Leonelli). Davis then took Leonelli to his police car and placed him in the back seat. Ptl. Glenn Wills then put the fire out with a fire extinguisher.

I checked the exterior of the house and did not locate anyone else. While I was checking the exterior other officers stated that the front door had damage to it in the area of the door handle and lock. They also stated they could smell gas. They stated they were going to check the house to make sure no one was hurt inside, or the house was not on fire.

Leonelli was transported to the Kendallville Police Department for processing. While at the Police Department Leonelli was being disruptive and threating officers. I could smell the odor of alcohol on his breath when he spoke. I left the Police Department and had no further contact with Mr. Leonelli.

Supplement case# 06050317

| INVESTIGATIONG OFFICER<br>Sgt. Mike McCann | DATE<br>6/14/07 | REVIEWED BY: |
|---|---|---|

35

**KENDALLVILLE POLICE DEPARTMENT**

NARRATIVE REPORT

| OFFENSE | | CASE # |
| --- | --- | --- |
| Resisting Law Enforcement | | 06050317 |

| COMPLAINANT/VICTIM | DATE OCCURRED | REPORT DATE |
| --- | --- | --- |
| State of Indiana | 5-3-2006 | 5-3-2006 |

## NARRATIVE

A case report reference a possible civil disturbance and a possible fire at 613 Granada Drive, Kendallville IN 46755. Officers were dispatched to 613 Granada Drive reference a civil disturbance and fire burning at this location. Upon officer arrival a male subject was discovered at the scene. The subject fled away from officers after being told to stop. The subject was taken into custody. Upon my arrival the male subject was already in the back seat of the car. Marshal Wills was completing the extinguishment of the fire in the front yard of the residence.

I spoke with Officer Davis near the front door of the residents. It was noticed there was evidence of forced entry to the front door. The residence was searched to determine if any subjects were injured in the residence. No one was located in the residence. I discovered a iron face down on an ironing board in the upstairs master bathroom. After we completed the search of the residence Officer Davis and I went to his squad car. We acquired the male subject's identification. He was identified by Indiana Driver's License as Bernard T. Leonelli. Mr. Leonelli had the odor of an alcoholic beverage on his breath. He advised he and his wife had an argument earlier. He further explained she exited the vehicle and was last seen walking on Main Street. Mr. Leonelli advised he was angry after this. Mr. Leonelli advised me he was the Department Psychologist for the Hobart Police Department. I located Mr. Leonelli's department identification card in his wallet. Mr. Leonelli was then transported to the Kendallville Police Department.

During the time Mr. Leonelli was at the Kendallville Police Department he was belligerent and abusive. Mr. Leonelli yelled at officers as they passed his cell, holding cell number three. Mr. Leonelli demanded to be released and demanded his wife be contacted. Mr. Leonelli also advised he was going to sue the police department. When I asked him to stop yelling and calm down he asked my name. I advised him I was Detective Lance Waters. At that point Mr. Leonelli stopped yelling and advised he recognized my name. I advised him I was attempting to contact his wife for him, but I needed him to stop yelling and calm down. Mr. Leonelli then advised he wanted to be left alone. I was not able to make contact with his wife. I made several attempts. Mr. Leonelli was later transported to the Noble County Jail.

Detective Lance Waters

36

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| DR. BERNARD T. LEONELLI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Cause Number: 1:07-CV-121-WCL |
| CITY OF KENDALLVILLE, | ) |
| PATROLMAN DOUGLAS M. DAVIS | ) |
| PATROLMAN MIKE MCCANN | ) |
| DETECTIVE LANCE WATERS | ) |
| SERGEANT LARRY RICHARDSON | ) |
| PATROLMAN JOHNNY RICHIE | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF DR. BERNARD LEONELLI

I, Dr. Bernard Leonelli, being duly sworn upon my oath, allege that I am personally competent to testify about the following matters about which I have personal knowledge:

1. My name is Dr. Bernard Leonelli. I am over the age of 21 years. I am personally competent to testify about the matter set forth herein, and I have personal knowledge of these matters.

2. On May 3, 2006, I lived with my wife, Mary Leonelli, at 613 Granada Drive, Kendallville, Indiana. No one else lived at the home with us on that date. This was the address that was on my driver's license at the time.

3. In the early evening of May 3, 2006, I went out to eat with my wife, Mary at Mad Anthony's restaurant in Auburn, Indiana. On the way home, I dropped her off near the home of her daughter and proceeded to return to our home on Granada Drive by myself. No one else was at home with me.

37

4.      After being home for a while, I took several bags of old clothing (belonging to

both Mary and I) that had been set by the front door to be sorted through for

garage sales, and removed them to the front of my lawn. I then set them on fire. I

did this on my own property.

5.      After setting the bags on fire, I went back into my home. As I re-entered my

home, I did not lock the front door behind me, but did shut a screen door that was

behind me. I continued to walk through a hall going towards the back of my

home and was turning around with a cell phone in my hand trying to call my wife

when I saw a police officer who had just entered through my front door. Up until

that point, I did not know that there was any police officer on my property, much

less following me into my home. Officer Davis had said nothing to me up to this

point and had failed to either knock, ring the doorbell, or announce himself before

entering my home.

6.      As I tried to call Mary, Davis announced himself as a Kendallville Police Officer

and informed me that I was under arrest for resisting law enforcement.

7.      I was unarmed, and did not try to fight or flee. Nevertheless, I was handcuffed

before being escorted by Davis to a squad car sitting in front of my house. I

cooperated with Davis' efforts to escort me out of my house.

8.      While I was in the squad car, I talked to Officer Davis. He, at one point, asked me

about a Protective Order/No-Contact Order, and I told him that it was regarding

my ex-wife, Jayme, who lived in Porter County. At the time, and now, Jayme

Leonelli lived in Valparaiso, Indiana, which is in Porter County. I told the officer,

2

38

furthermore, that the Protective Order did not have anything to do with my Granada Drive address. Furthermore, officers knew that I lived at the Granada Street address that I had just been removed from because Davis checked my driver's license while we were still at the scene, and my driver's license had my Granada Street address on it. Nevertheless, before being taken to the Kendallville Police Department, I was informed that I was being charged with resisting law enforcement by fleeing police and violation of the restraining order that my ex-wife, Jayme, had.

9.    After Davis talked to me in the squad car, I was left to wait there, as it sat in front of the house, for over an hour. As I waited, I became aware that police officers were going in and out of my house. I asked Davis a number of times why they were doing this, and he told me that they were "looking for Mary." I had told Officer Davis, and possibly a second officer that I now believe was named Waters, that I had a disagreement with my wife, Mary, earlier in the evening, had dropped her off in the area of Main Street in Kendallville when we were riding home from a restaurant, and that Mary had not gotten home yet. I never told the officers that Mary and I had been in any physical fight.

10.   None of the Defendants – Officer Davis, Waters, Richie, Richardson, or McCann – ever asked me if they could go into my house. None of them ever asked me if they could check inside the house to make sure that Mary or someone else wasn't inside needing help. All they told me about their activities inside the house was that they were "looking for Mary," but not why or what for. None of them said anything about looking for my ex-wife, Jayme. I don't know why I was charged

3

39

with invasion of privacy relating to Jayme's No-Contact Order, since Jayme had not been at my home on Granada Drive, and lived in a totally different city from me.

11.    Eventually, the charges I was arrested for were dismissed. The invasion of privacy charge was dismissed on June 23, 2006, because I was innocent of the charge. I was similarly innocent of resisting law enforcement, and that charge was dismissed on April 4, 2007, when the judge at my criminal trial found me not guilty of the charge. On May 3, 2006, I did nothing to attempt to flee or fight any of the officers that went into my home. I did not try at any point to run from Officer Davis, and when I entered my home I took my time, because I had no idea he or any other officers were present and had no idea that any officer wanted to talk to me. If he had bothered to knock on the door or ring the doorbell once I was inside the house, I would have let him in. However, he did not do this, and at no point did I invite him into my home. Similarly, at no point did any of the officers at my home ask to search it, nor did I give them permission. None of them obtained a search warrant either before entering my home.

12.    I was also innocent of the Violation of Privacy charge. On May 3, 2006 I did not have contact with my ex-wife, Jayme, nor had she been at my home.

13.    When the Defendants searched my home, they looked in cabinets and in drawers, and searched my computer. My kitchen cabinets are too small to fit an adult into. The bedroom drawers also are too small to fit an adult into. I know this because when I got home the next morning my wife, Mary, was home and she told me about finding her dresser drawers had been gone through and that cabinets had

4

40

been gone through. Mary said she had not gone through them and I know I had not gone through the drawers or cabinets. To the best of my knowledge from the time that I had arrived home the evening before, up to the time that Mary returned to the home, no one had been in the home other than myself, Officer Davis, and the other officers that searched my home, while I waited in the squad car in front of my house.

14.     In addition to having the drawers and cabinets within my home searched through, I learned that the Defendants had also searched my computer because it was on when I got home the next morning it was on although I had not had it on when I was removed from the home the night before. In addition, Mary said she had not gotten on the computer either. Again, the only other persons what would have had access to the computer before my arrival home the next morning would have been the Defendants. I was concerned about my computer having been searched because I do some of my work on my home computer and it contains confidential information.

15.     On the day of my arrest on May 3, 2006, there was minor, pre-existing damage on the frame to the front door of my house. This damage reflected in the photos shown in Exhibit 11(a) and (b). These photos accurately reflect what the door and door frame looked like on the day of the arrest. The frame has had a hairline crack in it since I bought the house, which is located on the portion of the frame along the middle right-hand-side of the door. The frame has not been painted, or repaired since I bought the house in 2004.

41

16.    I never tried to kick in the door to my home.  The frame to my front door was not splintered, and the damage on it is cosmetic.  On May 3, 2006, when officers were at my house, there were no foot prints on the door or door frame, no large scratches, no blood stains, and no other markings on it either, other than for the crack in the door frame.  In addition, the door opened and closed without problem, and the door handle and locking mechanism were undamaged.

17.    I never told any of the officers that I had damaged the door or door frame of my home by breaking through the door.

18.    There had been no argument at my home on May 3, 2006, neither with my wife Mary, or my ex-wife, Jayme.  I had not even had any contact with my ex-wife that day, nor for some time prior to that day, and she had not been at my home.  When I returned to my home after eating out with my wife Mary, and after dropping her off near her daughter's apartment, I was alone at my residence until officers arrived.  There was no yelling or screaming at my residence, either before or after the officer's arrival.

6

FURTHER AFFIANT SAYETH NAUGHT.

_____
Dr. Bernard Leonelli, Affiant

I affirm under penalties for perjury that the above and foregoing representations are true.

_____
Dr. Bernard Leonelli

S:\Leonelli, Bernard\Affidavit - Dr Leonelli.wpd/dd

7

43

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DR. BERNARD T. LEONELLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Cause Number: 1:07-CV-121 |
| CITY OF KENDALLVILLE, | ) | |
| PATROLMAN DOUGLAS M. DAVIS | ) | |
| PATROLMAN MIKE MCCANN | ) | |
| DETECTIVE LANCE WATERS | ) | |
| SERGEANT LARRY RICHARDSON | ) | |
| PATROLMAN JOHNNY RICHIE | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF STACEY SNYDER**

I, Stacy Snyder, being duly sworn upon my oath, allege that I am personally competent to testify about the following matters about which I have personal knowledge:

1. My name is Stacey Snyder. I am over the age of 21 years. I am personally competent to testify about the matter set forth herein, and I have personal knowledge of these matters.

2. I live at 2106 Logan Court in Kendallville, Indiana, and lived there in 2006. I know Dr. Leonelli because he is one of my neighbors. My house is located across the street from his home. I also know his current wife, Mary Leonelli. Both Dr. Leonelli and Mary Leonelli lived at 613 Granada Drive, Kendallville, Indiana, in 2006.

3. Attached hereto and made a part hereof as Exhibit "A," a copy of my Voluntary Statement regarding the incident on May 3, 2006.

4. I saw police officers arriving outside of Dr. Leonelli's home around 9:30 p.m. the same night.

44

5.      I did not tell officers outside the Leonelli home that I had heard a woman screaming from inside the home prior to their arrival that evening.

6.      While standing with a group of people outside of Dr. Leonelli's home, I never heard anyone say that there was any screaming from the home that day. All I said was, "Where's Mary, his wife?"

7.      I never told any officer that Dr. Leonelli's ex-wife lived at 613 Granada Drive in Kendallville, Indiana.


FURTHER AFFIANT SAYETH NAUGHT.


_____
Stacey Snyder, Affiant

I affirm under penalties for perjury that the above and foregoing representations are true.


_____
Stacey Snyder

-2-

45

se #: _____    **VOLUNTARY STATEMENT**    Date: 5-3-06

me: Stacey Snyder _____ DOB: 1-25-69 _ SSN: 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

ddress: 2106 Logan St, Kendallville _____ TEL#: 347-2292

I witnessed Bernard throwing clothing in the front
lawn, then throwing a cup (liquid) over the clothes
& set them on fire. The 1st blow up, I thought, was
going to set the weeping willow tree on fire.
My 1st thought was the house was on fire & to
call the fire department & walked across the
street to see exactly what was on fire when
I witnessed Bernard throwing the clothes out
& the cup of liquid to ignite the fire. We soon
heard the sirens & police were there shortly
thereafter.

Signature *Stacey Snyder*

ATTENTION...

is a Misdemeanor to knowingly and intentionally give false information
regarding the commission of a crime or an official investigation.

EXHIBIT A

46

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

DR. BERNARD T. LEONELLI,          )
                                  )
            Plaintiff,            )
                                  )
v.                                )
                                  )        Cause Number: 1:07-CV-121
CITY OF KENDALLVILLE,             )
PATROLMAN DOUGLAS M. DAVIS        )
PATROLMAN MIKE MCCANN             )
DETECTIVE LANCE WATERS            )
SERGEANT LARRY RICHARDSON         )
PATROLMAN JOHNNY RICHIE           )
                                  )
            Defendants.           )

## AFFIDAVIT OF GREG MILLER

I, Greg Miller, being duly sworn upon my oath, allege that I am personally competent to testify about the following matters about which I have personal knowledge:

1. My name is Greg Miller. I am over the age of 21 years. I am personally competent to testify about the matter set forth herein, and I have personal knowledge of these matters.

2. I live at 2107 Logan Court in Kendallville, Indiana, and lived there in May 2006. Both Dr. Leonelli and Mary Leonelli lived were my neighbors in May 2006, and lived at 613 Granada Drive, Kendallville, Indiana in May 2006. They still live at the same address.

3. On May 3, 2006, I saw Dr. Leonelli throw clothes on a fire burning in his front yard. I saw this around 9:15 p.m. that evening.

4. I saw police officers arrive outside of the 613 Granada Drive home around 9:30 p.m. the same night.

47

5.   I told an officer, that I talked to outside of the home, that I saw a man throw clothing onto a fire in the yard. I also provided officers a written statement describing what I witnessed.

6.   When I talked to the officer, I never told him that I had heard the sounds of anyone screaming from Dr. Leonelli's home. I never told any officer that I heard a woman screaming from the home that night. I also never told police officers that I heard anyone calling for help from the home. I never told any officers that I thought Mary Leonelli, or anyone else, might be injured inside the home, or inside needing help. I never told any officer that I thought someone was inside the home dead.

7.   I never told any officer that Dr. Leonelli's ex-wife Jayme lived at 613 Granada Drive in Kendallville, Indiana.

FURTHER AFFIANT SAYETH NAUGHT.

Greg Miller, Affiant

I affirm under penalties for perjury that the above and foregoing representations are true.

Greg Miller

-2-

48